636 So.2d 226 (1993)
Alex ABSHIRE, Plaintiff-Appellant,
v.
NATIONAL UNION FIRE INSURANCE CO., et al., Defendants-Appellees.
No. 91-929.
Court of Appeal of Louisiana, Third Circuit.
March 17, 1993.
*227 McHale, Bufkin & Dees, Robert McHale, Lake Charles, for plaintiff-appellant.
Leake & Andersson, W. Paul Andersson, New Orleans, for defendant-appellee-Ins.
Cooper, Ortego & Woodruff, Calvin Woodruff, Abbeville, for defendant-appellee Woodruff.
Before GUIDRY, STOKER, YELVERTON, THIBODEAUX and COOKS, JJ.
YELVERTON, Judge.
This appeal by Alex Abshire is from a judgment in favor of his attorney in a legal malpractice action. The attorney, Calvin Woodruff, represented Alex and Mary Abshire in the sale of their family owned business for $500,000. The purchase price recited in the sale instrument was represented by three promissory notes. The sale instrument, a "credit deed" form, did not require security for any note. The buy and sell agreement included security requirements of two first mortgages and a pledge of stock, but only one mortgage was provided at the closing of the sale, and it was not a first mortgage. The attorney never advised his clients to check the records for title and encumbrances.
The Abshires were never paid any part of the deferred sales price. They suffered loss. They sued their attorney contending that he knew before the sale that they wanted good collateral for their vendee's promises to pay. The defendant, at the trial, raised the defense that it was his client's own greed and haste, and not counsel's mistakes, that caused the loss. The trial judge, following a trial, made two findings of fact. First, the trial judge found that the attorney's duty was limited to disclosing the import of the instrument of sale and the consequences of its execution, and that the defendant had discharged that duty. Second, the trial judge found that, despite the "obvious deficiencies" in the credit deed prepared by Woodruff, these deficiencies were not the cause in fact of the damages to the Abshires.
In a minute entry, the trial judge did not attribute any fault to the failure of the attorney to advise his clients of the importance of checking title and encumbrances on the immovable property to be taken as security for the notes. Instead, the trial judge found that it was the fault of the Abshires that they failed to request title or asset examination. The trial judge concluded that the loss was caused 100% by the fault of the client, and in no way by the attorney.
Based on our careful examination of the testimony, assessed in the light of numerous documents in evidence, we find that the trial *228 judge erred manifestly in finding that Abshire failed to prove legal malpractice. We find also that some of the damages are traceable to the malpractice. Our reasons for so holding follow.

FACTS
Woodruff and Abshire had an attorney-client relationship that went back several years. They had also become personal friends. Abshire could not read and write, and he needed a lot of business and legal help. His wife could read and write, and she helped him as she could, but she was not a lawyer. The Abshires were the sole stockholders of an oil recovery and waste pit business, PAB Oil & Chemical Service, Inc. Woodruff was the lawyer for this company, and did all of its legal work. He handled the original purchase of PAB by the Abshires. He handled its regulatory requirements with the State of Louisiana, its litigation, and everything else.
PAB's office was in Abbeville, Vermilion Parish. The Abshires lived in Abbeville, and Woodruff practiced law there.
In late 1981 William H. Lambert was an attorney practicing in Lafayette, Louisiana. Jack Clothier was a businessman living in Lafayette. Discussions began for the purchase of PAB by Lambert and Clothier from the Abshires. The first meeting toward this purchase took place between Abshire, attorney Woodruff, Clothier, and Lambert, around November 1981.
A few weeks later, a deal was struck. The Abshires agreed to sell PAB and all its holdings, including real estate, for a total of $550,000. Of this amount, $50,000 was to be paid down and in advance. Another $50,000 was to be paid in cash on the day that the sale was closed. The balance of the purchase price of $450,000 was to be paid as follows:
1. A note executed by Jack Clothier for $260,000, payable to Holder, secured by a collateral note and mortgage on Clothier's home in Lafayette Parish;
2. A note executed by Lambert for $100,000, to be secured by a mortgage on Lambert's house in Lafayette Parish;
3. A note for $90,000 payable to Holder executed by Services World-Wide, Ltd., secured by a manual pledge of 100% of the stock in PAB.
Woodruff undertook the legal work in preparation for this sale. Several things had to be done. On its part, Services World-Wide had to substitute a pit closure bond with the Louisiana Department of Conservation. PAB corporate minutes had to be prepared for resolutions authorizing an exchange of property, as well as the election of a new Board of Directors.
The $50,000 down payment was made on January 22, 1982, by a check executed by Lambert on his law office account, dated January 22, 1982, payable to Calvin Woodruff and Alex Abshire. On January 29, 1982, the Abshires conveyed their camp to PAB for $100,000. This was done as part of a tax avoidance deal, recommended by Abshire's accountant, so that the Abshires could exchange with PAB a strip of land needed for access to the waste pit. On the same day, corporate minutes of a special meeting of the board of directors of PAB, to authorize the exchange, were prepared by Woodruff, in his stated capacity as corporate counsel of PAB. Woodruff later prepared the corporate minutes of action required to accomplish the sale of PAB stock, as well as all of its movable and immovable property. These minutes, dated February 19, 1982, reflected the new ownership of the company by Services World-Wide, which was described as a foreign corporation, represented by its attorney in fact and U.S. general counsel, William H. Lambert, of Lafayette, Louisiana. These minutes documented the action of the new officers of PAB authorizing the execution of the credit deed and the arrangement for payment of the purchase price to the Abshires in installments.
The closing of the sale took place on February 19, 1982. Lambert and Clothier produced the promised $50,000 in cash. Woodruff prepared the credit deed to Services World-Wide, brought it to the closing, and supervised its execution. Among the assets conveyed by this deed from the Abshires to Services World-Wide was $30,313.13 in cash in a PAB account at the Bank of Abbeville & *229 Trust Co., and $23,092.50 in accounts receivable. Clothier brought with him a collateral note and mortgage on his house, made payable to Bearer, in the amount of $260,000. This note and mortgage, for unexplained reasons, was dated March 27, 1981, about a year before the sale date.
Lambert did not have his promised mortgage prepared. A few days earlier, when Woodruff called Lambert for the property description for Lambert's mortgage, Lambert said he would prepare the mortgage himself and have it ready for the closing. He did not have it ready, but he promised it would be ready the following Monday.
The credit deed contained a flaw which went unnoticed: it did not require any security. According to the credit deed, an authentic act, the sale was complete upon the delivery of Clothier's $260,000 promissory note, Lambert's $100,000 note, and Services World-Wide's $90,000 note, all dated February 19, 1982. However, as stated earlier, a collateral note and mortgage by Clothier in the amount promised, although having a different date, was in fact delivered to the Abshires on the day of sale. Also, there was a manual pledge of the PAB stock by Services World-Wide.
The closing was done in Lambert's office in Lafayette on a Friday. When Woodruff learned that Lambert did not have his $100,000 mortgage ready as promised, he called Abshire aside and talked to him. Woodruff told Abshire that if he went ahead with the closing, he would be relying on Lambert's promise to produce the mortgage on Monday. Woodruff left the decision to Abshire, who indicated he wanted to close. The sale was closed.
Unbeknownst to the Abshires and Woodruff, the collateral mortgage security given by Clothier was already primed by judicial mortgages in excess of $47,000. Lambert's explanation for not bringing his mortgage was that he had not had time to prepare it. The Abshires never got a mortgage from Lambert. It was discovered later that he could not have produced a mortgage because he did not own any property.
It turned out that Services World-Wide, Ltd., was a Cayman Islands corporation. The first installment payment of $50,000 due on April 1, 1982, went unpaid. The payment of the next installment on May 1, 1982, also went unpaid. Letters in the record from Woodruff to Lambert and Clothier in April and July 1982 urged compliance with the sale obligations. This correspondence by Woodruff also reminded Lambert of the promised real estate mortgage. The correspondence called attention to other defaults, and pleaded with Lambert and Clothier that they at least meet and do something, even discuss some possible modifications of the terms of the sale. None of these efforts were availing. In due course, the Abshires went to other lawyers and this lawsuit followed.
Before leaving the narration of facts, which we have gleaned from either undisputed testimony or from the trial court's findings, a few more facts need mentioning.
One is that shortly before the closing Woodruff and Abshire learned that Clothier had been indicted in Texas for fraud. Abshire asked Woodruff if this would prevent the sale from taking place and Woodruff said it would not.
Another fact is that Woodruff expressed a concern to Abshire whether Clothier's home was worth the $270,000 mortgage given as collateral. Abshire responded that he had seen the house and it was worth it.
Also, Woodruff knew, as early as three weeks before the closing, that Abshire's purchaser and primary obligor, Services World-Wide, was a Cayman Islands Corporation, and that Lambert, its U.S. general counsel, was to be its attorney-in-fact at the closing. According to the credit deed to Services World-Wide, only $90,000 of the purchase price was to be paid by Services World-Wide; the balance was in the form of the two demand promissory notes executed by Clothier and Lambert. However, the corporate minutes prepared by Woodruff and executed on the day of closing, showed that Services World-Wide would pay the purchase price in installments, the first being $50,000 due on April 1, 1982, and a like payment being due on the first of each month thereafter until a total of $350,000 was paid. The balance of *230 $100,000, according to the corporate minutes, was to be paid in five annual installments of $20,000 each. These minutes further showed that Services World-Wide recognized its responsibility to post security for the payment of the sale price, and the security provided was described as "see credit deed." The security provided by Services World-Wide in the credit deed was Lambert's note for $100,000 and Clothier's note for $260,000.
Woodruff knew that Abshire wanted good collateral. Despite this, Woodruff did not try to determine the ability of Services World-Wide to pay the $450,000 purchase price. Nor did he suggest to Abshire that he make any such investigation. The credit deed prepared by Woodruff did not require either Clothier or Lambert to post any security for their demand notes. Woodruff did not investigate, nor did he advise his client to investigate, to determine whether Clothier's promised collateral note and mortgage gave Abshire a first lien, this despite Woodruff's knowledge that Clothier was under indictment in Texas. Woodruff did nothing to determine, nor did he advise his client to determine, whether Lambert owned property which could be mortgaged to secure his note. Woodruff testified at the trial that when the sale took place he did not know Lambert well, knowing him only as an attorney who operated in the "fast lane". Accordingly, when Woodruff at the closing cautioned Abshire that, by closing on that day, he would be relying on Lambert's oral promise to provide a mortgage, he neglected to caution Abshire that he would also be relying on Lambert's oral promise that he could give a valid mortgage. He also neglected to caution Abshire that his reliance on Clothier's collateral mortgage as a first lien, was at best only a reliance on an oral promise. He never gave Abshire any cautionary advice regarding Services World-Wide.
It is a fact that Abshire never requested Woodruff to check into Services World-Wide's financial condition. Abshire likewise did not request that the mortgage records be checked in Lafayette Parish to see if Clothier's collateral mortgage was a first lien. Abshire also did not request that Woodruff do any records checks to determine if Lambert could give him a mortgage on property. However, just as these negatives are established by the record, so is the fact that Woodruff never advised his client, Abshire, that there should be at least some minimum inquiry made into the ability of Services World-Wide, Clothier, and Lambert to furnish the desired collateral.
For his legal services in meeting with the parties, and preparing and executing the exchange, the corporate minutes, and the credit deed, Woodruff was paid $3,500 by his client, Abshire.

THE DEFENSE AGAINST LEGAL MALPRACTICE
The defense in this case was:
(1) Abshire "structured" the deal, including all collateral requirements and, therefore, Woodruff was not responsible for any losses, because the losses were the result of Abshire's bad business judgment and not Woodruff's legal assistance.
(2) Abshire did not ask Woodruff to do any financial checking or mortgage or title checking.
(3) Woodruff did not have time to do any of these checks because he was notified on Wednesday that the closing was to be on Friday.

WHAT THE TRIAL COURT FOUND
The trial court found that Woodruff complied with his duty to warn Abshire that he was not getting "first mortgaged security" when he advised Abshire that he would be relying solely on Lambert's promise to furnish a mortgage on his house.
The trial court believed that it was Abshire's fault that "over a period of three months during which there was intermittent negotiations, no background investigation was made or requested by Mr. Abshire of Mr. Woodruff." While recognizing the law as being that "... lawyers are obligated to scrutinize any contract which they advise their clients to execute, and are required to disclose the full import of the instrument and the possible consequences that may arise upon execution of it," the trial court attributed all of Abshire's damages to imprudence *231 in his business dealings, and none to a failure on the part of his attorney to advise him of the possible consequences that might arise upon execution of the credit deed.
The trial court said that Abshire threw caution to the wind.

EXPERT TESTIMONY
Only one expert testified. Roger Boynton, an attorney practicing in Vermilion Parish, testified for Abshire. He testified, in effect, that the degree of care, skill, and diligence which is exercised by prudent practicing attorneys in his locality required Woodruff to do a number of things that he did not do in this case. Pointing out that in addition to the obvious imperfections in the credit deed, notably the total absence of any requirements for collateral, Woodruff was at fault in not advising Abshire that because Services World-Wide was a foreign corporation, several inquiries should have been made. Also, it should have been ascertained whether it was authorized to do business in Louisiana, and to the deed there should have been attached a resolution of the board of directors authorizing the purchase, and the execution of evidence of the corporation's obligation to pay the purchase price. Boynton said he would have wanted to see financial statements of Services World-Wide. He also stated that other problems existed. A $100,000 closure bond put up by Abshire was to have been freed on the sale date by the substitution of one by Services World-Wide. This was not done. Also, the predated Clothier note and collateral mortgage, considering the known fact that Clothier was under indictment, "raised a red flag."

LEGAL MALPRACTICE
In no other agency relationship is a greater duty of trust imposed than in that involving an attorney's duty to his client. Plaquemines Par. Com'n Council v. Delta Dev., 502 So.2d 1034 (La.1987). An attorney is obligated to exercise that degree of care, skill, and diligence, which is exercised by prudent practicing attorneys in his locality. Ramp v. St. Paul Fire and Marine Insurance Company, 263 La. 774, 269 So.2d 239 (1972). Lawyers are obligated to scrutinize any contract which they advise their clients to execute, and are required to disclose the full import of the instrument and the possible consequences that may arise upon execution of it. Id.
Summed up, the defense in this case that Abshire "structured the deal," on close examination in the light of the facts, is nothing more than saying that Abshire must bear all of the fault because he dealt with the wrong people. It is the usual practice, we believe, for a businessman to work out a contract and then go to his attorney for legal help in perfecting it. Abshire in this case worked out the terms of the contract on his own with his purchasers, but he engaged an attorney to render legal services in order to perfect that agreement. Undisputed is the fact that an essential element of the attorney-client relationship here, was Abshire's expressed desire to get good collateral. We do not believe that the plaintiff in this case was required to hire an attorney and then tell him what to do. Being illiterate, Abshire was incapable of doing what he called upon his attorney to do for him. He relied on his attorney to see to it, within reasonable limits, that he had good collateral. It was his attorney's duty to see to it that the collateral contemplated by the contract was available, and that it was properly included in the contract of sale that he prepared. A cursory check of the conveyance and mortgage records of Lafayette Parish would have taken only a few minutes time. Such a check would have revealed that Clothier could not give Abshire an unencumbered mortgage on his house, and that Lambert could not give Abshire any mortgage on any immovable property, because he did not own any in that parish. Abshire made the business judgment to accept this collateral if it was good collateral. If indeed it was substandard conduct for Abshire to deal with Lambert and Clothier, and with the unknown Services World-Wide, Woodruff, with all the red flags waving, had some duty to protect Abshire against that substandard conduct. Meyers v. Imperial Cas. Indem. Co., 451 So.2d 649 (La.App. 3d Cir.1984).
At the very minimum, in the circumstances of this case, Woodruff owed to Abshire *232 the duty to advise him that in order to get good collateral on Clothier and Lambert's property, he should get the descriptions of the property and engage the services of someone, either another attorney or an abstractor, to at least determine ownership and encumbrances. No such advice was ever given. Woodruff cannot be excused from this obligation simply by attesting that the client never asked him if he needed such advice.
In American Acceptance Corp. v. Elmer G. Gibbons, III, Inc., 704 F.Supp. 684 (E.D.La., 1988), aff'd 881 F.2d 1072 (5th Cir.1989), Judge Mentz opined that even if the client never specifically requested that the attorney draft and record documents in a manner which would secure for his client a first lien on the property, it was implicit that the client desired the highest ranking lien on the property that could be obtained under the law. In the present case, Woodruff admitted that he was aware that his client wanted good collateral. Woodruff knew what that collateral was to consist of. It was he who made the suggestion that there be a manual pledge of the stock of PAB to secure the note of Services World-Wide. When he prepared the credit deed, however, Woodruff failed to mention any collateral requirements. While this omission was not, in and of itself, the cause-in-fact of any loss suffered by Abshire, the omission evidences an inattentiveness toward Abshire's collateral requirements. This was a half-million dollar transaction. Woodruff's sole advice to his client on the day of the closing was that he would have to rely on Lambert's oral promise to produce his mortgage on Monday. Abshire's desire for good collateral meant that he wanted the notes to be secured. This was not done with the notes of Clothier and Lambert. At the very least, Woodruff owed his client the duty to warn him that he should take some precautions to ascertain title and encumbrances. Either a non-alienation and mortgage certificate from an abstractor, or a mortgage certificate based on assessed property done by the clerk of court, would have done the job.
Finally, an attorney can almost never be excused from the performance of an obligation to his client by pleading that he did not have time.
We conclude that Abshire proved legal malpractice.

CAUSE IN FACT
It is not enough that the defendant was negligent. An attorney is liable for the harm caused by his negligence only if the client proves that such negligence is a cause in fact of that harm. Meyers v. Imperial Cas. Indem., Co., supra.
Abshire sold his business which he and the purchasers valued at $550,000. He was paid a total of $100,000. He was not paid the promised balance of $450,000. Therefore, he lost both business and purchase price.
The loss would probably not have occurred had Woodruff either ascertained the facts regarding the collateral picture personally, or insisted on Abshire acquiring those facts by some other means as a prerequisite to going through with the sale. Had this been done, Abshire, being a businessman of reasonable intelligence, probably would not have thrown caution to the wind; he would have refused to sign this contract as confected, or alternative collateral would have been provided.
The defendant's position is that the cause-in-fact of the loss of Lambert's mortgage was plaintiff's fault, because he had been warned that Lambert's mortgage was not there, that he would have to rely on Lambert's oral promise to provide it the following Monday, and that Abshire made that decision knowing the risk. We agree that this was an unwise decision by Abshire, but it was not the real cause of the loss of Lambert's $100,000 promise. It was no more the cause of the loss than was the failure to recite an obligation to mortgage in the credit deed. The truth was, Lambert could not have produced a mortgage because he owned no property. It was Woodruff, not Abshire, who made the decision to let Lambert prepare the mortgage and bring it with him to the closing. Woodruff knew that Lambert, a fellow attorney, operated "in the fast lane" as Woodruff put it at the trial. The failure to make some investigation, or at least to warn Abshire and insist that he learn more about *233 the "good collateral" that was to come from Lambert, was the cause-in-fact of this loss.
Also, Woodruff accepted without comment Clothier's collateral note for $260,000, dated almost a year before the closing, along with evidence that the note was secured by a recorded collateral mortgage. Woodruff did not tell Abshire that there was any risk involved in accepting that collateral. The mortgage was primed by judicial mortgages of $47,000. On foreclosure, Abshire was required to pay this amount in order to protect himself by bidding the property in. A reasonable businessman such as Abshire would not have accepted this collateral had he known that it did not constitute a first lien. Woodruff's failure to give him appropriate legal advice under the circumstances was the cause-in-fact of this loss.

THE DEFENSE OF FAILURE TO MITIGATE DAMAGES
The doctrine of mitigation of damages applies in Louisiana. Unverzagt v. Young Builders, Inc., 252 La. 1091, 215 So.2d 823 (1968). If the client proves that his attorney was guilty of legal malpractice, and that he suffered a loss, and the defense is that the client would have suffered that loss in any event, the defendant-attorney bears that burden of proof. Jenkins v. St. Paul Fire & Marine Ins. Co., 422 So.2d 1109 (La.1982).
The trial court's conclusion that the loss was Abshire's fault was based partly upon the court's perception of events taking place after the closing. The court believed that the agreement to set payments at $50,000 a month beginning April 1, 1982, was Abshire's mistake; that Abshire failed to seek legal redress after default on those payments until 1986; that he continued a social relationship with Clothier and Lambert long after the purchasers had defaulted; that he failed to request title or asset examination by Woodruff; that he instructed Woodruff not to file suit against Clothier, Lambert, or Services World-Wide; that he attempted to "salvage" the deal as late as July 21, 1982; that he failed to follow the advice of any of the other attorneys he consulted and pursue his legal remedies; and that he failed to regain control of PAB Oil although he had a pledge of 100% of the common stock and held "bearer" notes that could have been sued upon at any time.
These were findings that Abshire failed to mitigate his damages, and we cannot agree that they have the effect of a failure to mitigate. These events took place commencing in 1982. The case was not tried until 1990. There was little evidence adduced to explain these occurrences. Even so, there was nothing wrong with Abshire trying to salvage the deal, and keeping up a friendship with Clothier and Lambert was a means of doing that. If there was anything wrong at setting payments at $50,000 a month beginning April 1, 1982, this was done with the full approval of Woodruff as it was he who prepared the credit deed and its recitation of the consideration as demand promissory notes, and, at the same time, the corporate minutes which had all parties agreeing to an installment payment plan. As to the failure of Abshire to follow the advice of other attorneys that he consulted, and go to litigation against these parties, his explanation appears to be reasonable: he said he was advised that it would be throwing good money after bad. What we know about this case substantiates the soundness of that advice. His failure to regain control of PAB, following several months of trying to salvage the deal, is likewise reasonable: he explained that he did not want to take the business back because Services World-Wide did not stay in the business long, did not follow the guidelines, "they had messed it up", and the pits were closed. They never even provided a pit closure bond with the Louisiana Department of Conservation.

DAMAGES
When Clothier's house was sold at Sheriff's Sale, Abshire paid $47,976.13 to buy superior judicial mortgages, and acquire title to the property. The Sheriff's Sale proceedings suggest that perhaps the property was not worth $260,000. Nevertheless, Abshire believed it was worth that based upon his own observation. This was a business decision for which Woodruff was not responsible. The amount that Abshire had to pay to buy *234 out the superior lienholders, however, is an item of damage which he can recover.
The legal malpractice caused the loss of the $100,000 due by Lambert. The defendants have failed to bear their burden of proving that this sum was so easily recoverable by Abshire from Lambert that his failure to do so amounts to a failure to mitigate damages.
We have already pointed out that, because the purchasers allowed PAB to deteriorate after the sale, Abshire could not recoup his entire loss by using the pledged stock to take the business back. Nevertheless, it is reasonable to conclude that the land, equipment, and other assets of the business had a residual value equal at least to the $90,000 note owed by PAB, and we find that Abshire has no right to recover that sum from his attorney.
Abshire is also entitled to the $3,500 in legal fees paid to Woodruff.
For the reasons assigned, we reverse the trial court, and render judgment herein in favor of Alex and Mary Abshire, and against the defendants, including National Union Fire Insurance Company, in the amount of $151,476.13, with legal interest from date of judicial demand, and all costs both below and on appeal.
REVERSED AND RENDERED.
STOKER, J., dissents and assigns reasons.
GUIDRY, J., dissents for the reasons assigned by STOKER, J.
STOKER, Judge, dissenting.
This is a legal malpractice action against an attorney, his law firm and their insurer. The plaintiffs seek damages but their entitlement to damages depends upon a conclusion that plaintiffs were wronged through legal malpractice by Calvin E. Woodruff. A distinguished trial judge heard the evidence, and in well written reasons for judgment, reviewed the facts and concluded without hesitation that Woodruff was not guilty of malpractice. The trial judge held that the business loss plaintiffs suffered resulted from their own blundering and haste to push through a deal which they had structured themselves with William H. Lambert and Jack Clothier. In my opinion the decision of the trial judge is eminently correct. On the contrary, the majority finds the trial judge's holding to be manifestly erroneous and reverses the trial judge. The result of the reversal is not merely to award damages to the plaintiff; the reversal also affects the professional reputation of the attorney.
I dissent.
In my opinion the majority's reasoning and ruling is misguided and unfair. The attorney in this case played virtually no role in confecting the deal with Lambert and Clothier. The majority's opinion carefully reviews the facts, but it does not reflect the fact that, although Mr. Abshire could not read or write, he was not naive and was in fact a very experienced business man. As I appreciate the case, Mr. Abshire never really gave Mr. Woodruff a chance to counsel him, and such caution as Woodruff did give, Abshire seems to have ignored and waived aside.
I agree with the written reasons of the trial judge, attach a copy to this dissenting opinion and adopt them as my own. To these reasons I will add these views responding to the majority opinion. The majority holding goes too far and puts a burden on an attorney to make business judgments for his client which are not his responsibility. According to the majority, an attorney is bound to assess business risks and make investigations and judgments regarding the character, trustworthiness and reputation of parties with whom the client deals. The majority would have an attorney intrude himself into the business affairs of the client, countermand his decisions and virtually constitute himself a curator for the client.
With regard to making title examinations or verifying the legal status of entities with whom a client deals, this is something an attorney does at the client's request. (Obviously, an attorney should not fail to disclose facts his client ought to know if the attorney actually knows them.) I do not consider it to be the obligation of an attorney to volunteer such investigations. Clearly, an attorney should advise his client that such checks should be made. It is clear in this case, *235 however, that about all Abshire wanted from Woodruff were ministerial services, to read the documents he could not read and to prepare corporate resolutions for Abshire's corporation. Abshire was satisfied with the substance of the arrangements which he helped structure.
With regard to the alleged deficiencies of the credit sale, there is nothing in law that requires that the document require security in the form of mortgages with the credit document. Abshire was even so rash as to sign the sale although Lambert did not produce his collateral mortgage note and despite Woodruff's clear explanation of the risk he was taking.
For the foregoing reasons, I dissent.
I attach hereto as exhibit A, the written reasons for judgment of the Honorable Bernard N. Marcantel, District Judge Ad Hoc, which, as I mentioned above, I adopt.

EXHIBIT A

Alex Abshire, et al.

vs. No. 83-45892-K

National Union Fire Insurance Company, et al.

15th Judicial District Court

Parish of Vermilion

State of Louisiana

MINUTE ENTRY
THIS is a suit for damages resulting from alleged legal malpractice. The plaintiffs, Alex Abshire and his wife, Mary Ann Pere Abshire sued Calvin E. Woodruff, Jr., his law firm Cooper, Ortego & Woodruff (A Law Corporation) and their professional insurer, National Union Fire Insurance Company.
In order to present the factual situation, the Court will review its findings of fact. It is undisputed that Calvin E. Woodruff, Jr., is a Louisiana attorney at law practicing in Abbeville, Louisiana associated with the law firm of Cooper, Ortego and Woodruff (a law corporation chartered under the laws of the State of Louisiana). National Union Fire Insurance Company has answered on behalf of all parties in a general denial, except to admit coverage and that Woodruff, at times pertinent hereto, did participate in passing an Act of Sale wherein Alex Abshire and Mary Ann Pere sold certain common stock and property to Services World-Wide, Ltd. a foreign corporation being represented by William H. Lambert, an attorney practicing in Lafayette, Louisiana.
The purpose of the sale was to transfer 100% of the common stock of PAB Oil & Chemical Services, Inc., a domestic corporation which was owned by Alex Abshire and his wife Mary Ann Pere. There were one hundred shares outstanding which were owned 50-50 by the plaintiffs. PAB Oil was in the business of operating an oil field waste disposal pit.
Negotiations for the sale of the common stock were initiated by Bill Lambert and Jack Clothier with Alex Abshire on approximately November 1, 1981. The initial discussion was held among Alex Abshire and his attorney, Calvin Woodruff, Jack Clothier and Bill Lambert. The latter two were apparently the sole owners of Services World-Wide, Ltd. which had been incorporated in the Cayman Islands. Although there was some discussion about two law suits in which PAB was involved and a general discussion concerning the purchase of PAB Oil by Clothier and Lambert, nothing concrete was decided. At this meeting no discussion was held on the status of Services World-Wide. Indeed, it is unclear whether the corporation existed at that time. The sale to Lambert and Clothier was "put on hold".
Some time, thereafter, Abshire testified he had informed Woodruff that he and his wife would sell the stock for $500,000.00 cash or part cash and "good collateral for the balance".
There was an on-going discussion among the parties which eventually culminated in a deal being struck. Although it was not reduced to writing, the parties agreed that one hundred shares of PAB would be sold to Lambert and Clothier for $500,000.00, to be represented by a $50,000.00 down payment which was received on January 22, 1982 at the Woodruff law office. The check was drawn on "Law Offices of William H. Lambert". *236 On January 29, 1982 the Abshires sold their camp to PAB for $100,000.00 in anticipation of exchanging with PAB a strip of land owned by Abshire which provided access to the waste pit. This exchange was a tax avoidance maneuver.
The sale of the stock was made on February 19, 1982 (Exhibit P-2 and P-2A), at the office of Lambert in Lafayette. At that time the deal began to go sour. Although Lambert and Clothier gave Abshire an additional $50,000.00 in cash as a "bonus" they failed to provide security as had been promised in order to secure the balance due of $450,000.00. Instead, for the balance of the purchase price, Jack Clothier gave his mortgage note dated March 27, 1981, made payable to "Bearer" in the amount of $260,000.00 (Exhibit P-5), William H. Lambert gave an unsecured note in the amount of $100,000.00 dated February 19, 1982 (Exhibit P-3) made payable to "Bearer" and Service World-Wide, Ltd. gave its note dated February 19, 1982 in the amount of $90,000.00 secured by a manual pledge of 100% of the stock in PAB which Abshire continued to hold in pledge. Also, Service World-Wide undertook to substitute a pit closure bond with the Louisiana Department of Conservation.
Lambert and Clothier defaulted on their obligations. Lambert told the Abshires he did not have a mortgage note prepared on his home but would furnish one the following week. Clothier furnished a mortgage note dated the previous March but it was not a first lien because a judgment primed it.
We come now to the critical juncture in the dealings. Malpractice is charged because Woodruff did not warn plaintiffs that they were not getting first mortgaged security and did not attempt to prevent the deal from being done.
Mr. Woodruff's version is quite different:
"I don't recall the term good collateral, and Iwhat I said waswell, let me explain what Iwe went out in the hall when we went through a check list of what documents were there. I had some documents prepared, Mr. Lambert already had some documents: the notes and the Clothier mortgage. When it came to the Lambert mortgage, he said, `I haven't had a chance to prepare it.' I had offered to prepare the mortgage. I had called him on the Wednesday or Thursday for a property description. And he said, `I will prepare it and have it for your review at the closing.' I said fine.
We got to the closing. He said, `I do not have it prepared. I didn't have time.' At that point, I asked for a recess. Mr. and Mrs. Abshire and I went out into the hall, directly outside of Mr. Lambert's office, and I wasI was in a quandary at that point. I didn't know whether to proceed or not to proceed. I discussed with him that did they understand the mortgage was not prepared and would not be executed that day. Before we walked out, Lambert said he would have it by Monday. I asked the Abshires if they wanted to close without the mortgage and rely upon Lambert's promise to have it by Monday, or postpone the transaction until Monday. I told them that if they closed that day, the mortgage would not be executed that Friday. They would have to wait and rely upon Lambert's promise.
They clearly indicated to me that they wanted to proceed, and did not want anything to hold up the closing on that Friday. We went back in, and Lambert said, `I will have it by Monday.' They said, `Fine.' It was closed."
This Court believes that the decision to proceed was knowingly made by the plaintiffs and that they had structured the deal and continued to completely control all proceedings thereafter. Mr. Abshire himself readily admitted he sought the $50,000.00 "bonus" from Jack Clothier:
"And after talking to Mr. Woodruff, knowing that they was going to buy me out, I figured that I could get some money, maybe, fromhead money, you know, or as a tip, you know. So, I called Jack Clothier from Mr. Woodruff's office, and I asked him about making all this money, if he wouldn't allow fifty thousand dollars cash money at the sale for me. He says, `Sure.' He said, `We'll give you that' Hung up, told Mr. Woodruff thatthat I was *237 going to get fifty thousand dollars. He said, `You sure?' I said, `Yeah, he told me that."
This view is enforced by the fact that plaintiffs ignored Woodruff's warnings about Clothier being indicted in Texas, their haste to close the deal on a late Friday afternoon, their agreement to set payments at $50,000.00 a month beginning April 1, 1982, their failure to seek legal redress after default on those payments until 1986, their continued social relationship with Clothier and Lambert long after the purchasers had defaulted, their failure to request title or asset examination by Woodruff, their instructions to Woodruff not to file suit against Clothier, Lambert or Services World-Wide, their attempt to "salvage" the deal as late as July 21, 1982 (Exhibit P-8), their failure to follow the advice of any of the other attorneys they consulted (Exhibits D-1, D-2, D-3) and pursue their legal remedies, their failure to regain control of PAB Oil although they had a pledge of 100% of the common stock and held "Bearer" notes that could have been sued upon at any time.
This Court finds that Alex Abshire threw caution to the winds and this is incredible because Alex Abshire was experienced in business ventures. He is a middle-aged man who has owned and operated a body shop, a lounge, a teen center, a western wear retail store and PAB Oil. He told the Court he had experience in buying, selling, leasing and dealing in real property. He had on occasion obtained mortgage and title certificates but on this deal, he readily admitted he never sought any credit reports or mortgage certificates on Clothier and Lambert.
To this Court it is incredible that over a period of three months during which there were intermittent negotiations, no background investigation was made or requested by Mr. Abshire of Mr. Woodruff.
This Court does not believe the law requires a lawyer to prevent his client from being imprudent in his business dealings.
In Ramp v. St. Paul Fire and Marine Insurance Co., 269 So.2d 239, 263 La. 774 (1972), the Supreme Court enunciated certain legal malpractice ground rules.
"An attorney is obligated to exercise at least that degree of care, skill and diligence which is exercised by prudent practicing attorneys in his locality. He is not required to exercise perfect judgment in every instance. However, the attorney's license to practice and his contract for employment hold out to the client that he possesses certain minimal skills, knowledge and abilities. The fact that an attorney's judgment in confecting contracts, handling suits, and doing other business may result in litigation is not, in and of itself, a breach of duty to the client. Risk of future litigation is often a necessary element or result of legal advice and legal representation. The very fact of litigation is a result of the disparity of the professional judgment of those in the legal profession. However, lawyers are obligated to scrutinize any contract which they advise their clients to execute, and are required to disclose the full impact of the instruments and the possible consequences that may arise upon execution of it."
This Court finds Mr. Woodruff advised the Abshires they were relying solely on Lambert's promise to furnish a mortgage on his house:
"I told them that if they closed that day, the mortgage would not be executed that Friday. They would have to wait and rely upon Lambert's promise. They clearly indicated to me that they wanted to proceed and did not want anything to hold up the closing on that Friday."
This testimony is corroborated by Mrs. Paula Woodruff who was present and who acted as the Notary Public. (Tr. p. 489)
This Court believes the preponderance of the evidence is that Woodruff discharged his duty to disclose the full import of the instrument and the consequences of its execution. This case is similar factually to Gill v. DiFatta, 364 So.2d 1352 (4th Cir.1978).
In DiFatta the Court noted: "In the present case the contract arguably had several deficiencies which might have resulted in substantial problems or losses by DiFatta. *238 Nevertheless, Gill's failure to note these deficiencies was not the cause of any damage to DiFatta."
Likewise, there were obvious deficiencies in the contract which was styled a "Credit Deed" in the case sub judice but this Court is unable to conclude that the deficiencies were a cause in fact of damages to the Abshires. None of these deficiencies were ever employed by Clothier, Lambert or Services World-Wide as defenses to their obligations. This Court has concluded that plaintiffs have failed to carry their burden of proof which is that Calvin E. Woodruff, Jr. failed to exercise that degree of care, skill and diligence which is exercised by prudent practicing attorneys in Vermilion Parish. See Nelson v. Waldrup, 565 So.2d 1078 (La.App. 4th 1990).
The Court finds for defendants and assesses all costs to plaintiffs. Counsel for defendants will prepare a judgment for signature and have it approved as to form by plaintiffs' counsel.
DONE AND SIGNED at Abbeville, Louisiana on this 28th day of February, 1991.
 /s/ Bernard N. Marcantel
 District Judge Ad Hoc
 Bernard N. Marcantel
Filed February 28, 1991