11 TERRI F. LOVE, Judge.
This appeal arises from the trial court’s judgment dismissing substituted plaintiff, Ted Hoyt, as executor of the Succession of David Jeansonne, action asserting legal malpractice. David L. Jeansonne filed suit asserting attorney W. Philip Clinton and his employer, Jones,- Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P., the defendants, committed legal malpractice by: (1) failing to discuss the consequences of a stock purchase agreement and promissory note and (2) failing to advise the plaintiff of a conflict of interest. After a hearing on the merits, the trial court dismissed the plaintiffs claims on the merits and on the grounds of peremption. For the reasons assigned below, we affirm the judgment of the trial court.

FACTS AND PROCEDURAL HISTORY

We find the trial court’s recitation of the facts to be accurate and we repeat:
Philip Clinton, defendant herein, began representing Omni Geophysical, L.L.C., the predecessor to Omni Energy Services Corp. (“Omni”) in August, 1997 and had his first contact with David Jeansonne at that time. Clinton worked on the initial public | ^offering (“IPO”) of Omni stock, which was completed in December, 1997 resulting in a $34.275 million cash infusion into Omni. Jeansonne was the founder and visionary of Omni and served as its Chairman of the Board and Chief Executive Officer before and after it went public. Jeansonne personally owned or controlled through his 90% interest in American Aviation, Inc. (“AAI”) roughly 1.4 million Omni shares having a value of between $14 and $28 million during the Spring and Summer of 1998.
Jeansonne was a sophisticated businessman, an accomplished business builder and a decisive deal maker. While serving as Chairman of the Board and CEO of Omni, Jeansonne also operated several successful businesses in addition to Omni and AAI, including Magnolia Farms (horses and real estate), Southern Leisure, Inc. (boat and Pecan Island property), and Vintage Wings and Things (aircraft).
Ted W. Hoyt is the substitute plaintiff in this case as Jeansonne’s executor. Hoyt first met Jeansonne in 1983 or 1984 and together they formed Omni Drilling Company, later Omni Geophysical Corp., at which time the “Hoyt Group” owned 90% and Jeansonne owned 10%. By 1996, Omni Geophysical was owned 50% by Jeansonne and 50% by the Hoyt Group. They sold the business to the predecessor of Omni in 1996 for approximately $13.3 million. Jean-sonne remained Board Chairman and Chief Executive Officer.
In July, 1997, Jeansonne caused AAI to sell its aircraft assets to the predecessor of Omni in return for consideration ultimately having a value in excess of $19 million consisting of cash,- assumption of $6.7 million of -AAI debt, and 1,080,017 shares of Omni stock. Jean-sonne himself renegotiated the deal with the Omni Board.
From August, 1997, Clinton worked closely with Jeansonne on numerous matters including the IPO, several mergers, and acquisitions of other companies, and other corporate affairs. Jeansonne himself negotiated many of these deals. He called on Clinton to prepare the documents for Jeansonne’s signature. Clinton considered Jeansonne to be a sophisticated businessman, decisive and someone who understood the art of the deal, *724 pursued deal terms aggressively and gave clear instructions to counsel both as to (i) terms to be drafted, and (ii) the extent to which Jeansonne was willing to participate in review or discussion of the agreements once drafted. Jeansonne always exercised his prerogative to dictate the overall objectives, character and extent of Clinton’s representation.
Patrick Morris and Jeansonne formed AAI together in 1995. Jeansonne has testified that Morris was a “very vital player in what I was doing.” Although, technically, Morris owned 10% of AAI, Jeansonne considered Morris in reality to own 20%. In the fall of |a1997 and into 1998, Morris was in need of cash and Jeansonne wanted to get money into Morris’ hands.
Jeansonne began discussing the tax consequences of a transaction with Charles Giraud and others at Arthur Anderson, L.L.P. Jeansonne later asked Clinton to participate for purposes of securities law advice and to prepare the documents, once a structure had been decided upon.
Jeansonne intended to get a total of 2.5 million into Morris’ hands. Many alternatives for -doing this were proposed and discussed with the Arthur Anderson group because of tax implications. Then, Jeansonne unilaterally decided he had had enough of discussing “tax-advantaged” alternatives and he, individually, was just going to buy out Morris’ interest in AAI for $2.5 million payable $1 million in cash and $1.5 million represented by a promissory note payable in one year.
On July 6 and 8, 1998, Jeansonne and Clinton discussed the terms of the transaction and Clinton was directed to prepare the stock purchase agreement and promissory note. Clinton drafted the two, two-page documents containing precisely the terms discussed with Jean-sonne.
Among those terms were two unusual, non-standard business terms discussed with Jeansonne. They merit special mention because they evidence the particularity with which Jeansonne approached his deal with Morris. First, paragraph 4 of the Stock Purchase Agreement obligated Morris to use $500,000 of case [sic] received by him under the agreement to acquire stock in Omni. If he failed to do so, $500,000 could be set off against the $1.5 million payment due under the promissory note. Jeansonne told Clinton he wanted this provision to ensure Morris’ continued interest as an employee of Omni. Clinton included this provision as directed.
Second, the promissory note has a special mandatory 'prepayment provision requiring the note to be paid earlier than one year if a secondary public offering of Omni stock successfully occurred before one year and Jeansonne was able to realize $1.5 million from this event. Clinton also included this provision as directed....
The Clinton drafts were transported to Jeansonne via Morris as a courier on July 14, 1998. Shortly after, Jeansonne called Clinton and they discussed the documents again.
Both the Stock Purchase Agreement and the Promissory Note were signed on an unknown date. They have a handwritten date of July 17, 1998. However, Morris told Clinton that the deal was not completed until November, 1998, and wrote a letter dated December 31, 1998 ... stating that the stock sale “finally closed on November 18, [1998]
[W]hen the payment of the note became a reality, and after the Estate of *725 Morris sued Jeansonne in federal court on November 26, |41999 for recovery on the note, Jeansonne filed this action against Clinton on March 26, 2000.
[Emphasis in original]
The trial court dismissed the case on both the merits and on the grounds of peremption.
Standard of Review
We have recognized, “Great deference is accorded to the trial court’s factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court’s judgment.” Vignette Publications, Inc. v. Harborview Enterprises, Inc., 2000-1711, p. 7 (La.App. 4 Cir. 9/12/01), 799 So.2d 531, 536. Consequently, a “trial court’s finding of fact may not be reversed absent manifest error or unless they are clearly wrong.” LaBove v. Raftery, 2000-1394, p. 7 (La.11/28/01), 802 So.2d 566, 572. The Supreme Court has instructed that:
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one. The reviewing court must always keep in mind that “if the trial court’s or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.”
Id., p. 8, 802 So.2d at 572, citation omitted. Importantly, “[w]here a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.” Vignette Publications, 2000-1711, pp. 7-8, 799 So.2d at 536. A trial court’s finding as to when the one-year peremptive period of La. R.S. 9:5605(A) | ¡^begins to run. is factual in nature and will not be disturbed on appeal absent manifest error. See, Williams v. Webre, 2004-0032 (La.App. 4 Cir. 5/26/04), 876 So.2d 858; Turnbull v. Thensted, 99-0025 (La.App. 4 Cir. 4/28/00) 757 So.2d 145; Lambert v. Toups, 99-72 (La.App. 3 Cir. 10/13/99), 745 So.2d 730.

LEGAL ANALYSIS

Mr. Jeansonne argues the Trial court erred in holding the action was not timely filed and therefore perempted. He asserts the trial court wrongly held that the per-emptive period began to run on July 24, 1998 the day the Stock Purchase Agreement and Promissory Note were signed.[1] The plaintiff avers the peremptive period began when Mr. Morris requested payment of the $1.5 million Promissory Note on March 25, 1999. Defendant, Mr. Clinton, argues this Court should uphold the finding of the trial court in that Mr. Jean-sonne had constructive notice of any alleged malpractice on the date of the signing of the note.
La. R.S. 9:5605 provides the peremptive periods for legal malpractice actions. It states in pertinent part:
A. No action for damages against any attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of this state to engage in the practice of law, whether based upon tort, or breach of con *726 tract, or otherwise, arising out of an engagement to provide legal services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered; however, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect, [emphasis added]
La. R.S. 9:5605(A).
^Pursuant to La. R.S. 9:5605(A), the peremptive period for all legal malpractice claims is one year from the date of the alleged negligence is or should have been discovered, coupled with a mandatory three-year peremptive period from the date of the alleged negligence, regardless of when it' was discovered. Turnbull v. Thensted, 99-0025, p. 6 (La.App. 4 Cir. 3/1/00) 757 So.2d 145, 149.
Prescription begins to run when a claimant knew or should have known of the existence of facts that would have enabled him to state a cause of action for legal malpractice. Turnbull, 99-0025, p. 8, 757 So.2d at 150. The standard imposed is that of a reasonable man. The standard is designed to establish a rule that any plaintiff who had knowledge of facts that would place a reasonable man on notice that malpractice may have been committed shall be held to have been subject to commencement of prescription by virtue of such knowledge even though he asserts a limited ability to comprehend and evaluate the facts. Id.
In accordance to La. R.S. 9:5605, in ascertaining whether Mr. Jeansonne’s claim for legal malpractice was perempted, in- the case sub judice we find the first dispositive issue to discern is at what time Mr. Jeansonne acquired knowledge of facts that would place a reasonable man on notice that Mr. Clinton allegedly failed to properly draft the contract and failed to advise him of the consequences of the contract. “[0]ur view of the jurisprudence convinces us that the determination as to when the client’s cause of action arose must be made on a case-by-case basis.” Jones, Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P. v. Homestead Insurance Company, 97-0710, p. 4 (La.App. 4 Cir. 9/10/97), 700 So.2d 233, 235. Mr. Jeansonne testified that he “glanced” at the “key issues” prior to signing the documents. The documents are dated and signed on July 17,1998.
|7A person who signs a written contract is presumed to know its contents and cannot avoid its obligations by contending he did not read the document, or that it was not explained, or that he did not understand it, barring misrepresentation, fraud, or violence. Tweedel v. Brasseaux, 433 So.2d 133 (La.1983). See, Boh Bros. Construction Co. v. Price, 2000-2233, p. 6 (La.App. 4 Cir. 8/29/01), 800 So.2d 898, 902. However, when that person has sought an attorneys expertise, the attorney is obligated to scrutinize any contract, which he advises his clients to execute, and is required to disclose full import of the instrument and the possible consequences that may arise upon execution of it. Abshire v. National Union Fire Insurance Company, 636 So.2d 226, 231 (La.App. 3rd Cir.1993). It is well established that in no other agency relationship is a greater duty of trust imposed than in that involving an attorneys duty to his client. Plaquemines Parish. Comn Council v. Delta Development Co., Inc., 502 So.2d 1034, 1040 (La.1987). An attorney is obligated to exercise *727 that degree of care, skill, and diligence, which is exercised by prudent practicing attorneys in his locality. Ramp v. St. Paul Fire and Marine Insurance Company, 263 La. 774, 786, 269 So.2d 239, 244 (La.1972).
The trial court held that Mr. Jeansonne had ample opportunity to read the documents and determine the consequences if they were executed. The trial court further held that Mr. Jeansonne was very capable of determining, even by glancing at the face of the papers, that payment of the promissory note was not excused if there was no successful public offering of Omni shares. The trial court reasoned that by glancing at the key issues in the Promissory Note, Mr. Jeansonne should have known payment of the Promissory Note was not conditional on a second public offering and Mr. Clinton possibly failed to advise him of this consequence on the date Mr. Jeansonne signed the documents. The trial court further opined 1 sthat at the latest, Mr. Jeansonne should have known on the date of signing, November 1998, by glancing at the documents, whether Mr. Clinton failed to discuss the consequences of the pending transaction. According to the analysis of the trial court, Mr. Jean-sonne possessed knowledge of the alleged legal malpractice committed by Mr. Clinton, on July 14, 1998, the handwritten date on the Stock Purchase Agreement and the Promissory Note, but at the very latest in November 1998, the date confirmed in the December 31, 1998 letter to Mr. Clinton from Mr. Morris. Therefore, in light of the trial courts reasoning, the trial court found that Mr. Jeansonnes cause of action preempted in July 1999, one year after the trial court found that Mr. Jeansonne had knowledge of the alleged legal malpractice. In its Reasons for Judgment the trial court held:
As the architect of his deal with Morris, and as one who undoubtedly could distinguish between an unconditional promise to pay and a promise conditioned on an event such as a public stock offerings, Jeansonne can not assert even a limitation on his ability to comprehend and evaluate.”
However, we agree with our brethren in the Third Circuit that, “It is the usual practice, we believe, for a businessman to work out a contract and go to his attorney for legal help in perfecting it.” Abshire v. National Union Fire Insurance Company, 636 So.2d 226, 231 (La.App. 3rd Cir.1993). Therefore, we find that the trial courts finding of fact is manifestly erroneous in light of the record reviewed in its entirety. Rosell v. ESCO, 549 So.2d 840 (La.1989). Accordingly, in light of the Louisiana Supreme Court’s holding in Rayne State Bank and Trust Company v. National Union Fire Insurance Company, 483 So.2d 987 (La.1986), Louisiana prescription does not begin to run until damage is sustained.
Mere notice of a wrongful act will not suffice to commence the running of the prescriptive period. The | flreason is clear. In order for the prescriptive period to commence, the plaintiff must be able to state a cause of action — both a wrongful act and resultant damages. Because the damages must necessarily occur after the wrongful act, prescription runs from that point and not from the date of the wrongful act. Thus until damage was “sustained” by the bank, it had no cause of action, and prescription did not commence to run on the date the bank received notice of possibly fatal defects in the mortgages.
Id. at 995. [Citations omitted.]
In the case sub judice, prescription did not begin to run until the damage was sustained. If Mr. Jeansonne’s “glancing” at the documents was mere notice of the *728 attorney’s wrongful act in failing to perfect the contract as requested, such will not suffice to commence the running of the prescriptive period. The correct standard is whether a reasonable person in Mr. Jeansonne’s position at the time knew or should have known of the alleged malpractice. In order for the prescriptive period to commence, Mr. Jeansonne must be able to state a cause of action, both a wrongful act committed by the attorney who represented him and a resultant damage from that wrongful act. Id. at 995.
In order to sustain a claim for legal malpractice, the plaintiffs must allege there was an attorney-client relationship, the attorney was guilty of negligence or professional impropriety in his relationship with the client and this misconduct caused plaintiff some loss. Evans v. Detweiler, 466 So.2d 800 (La.App. 4th Cir.1985); Ramp v. St. Paul Fire & Marine Ins. Co., 263 La. 774, 269 So.2d 239 (La.1972). Because the damage must necessarily occur after the wrongful act, prescription began to run from the date the damage occurred and not the date of the wrongful act. Id. at 995. Thus, until Mr. Jeansonne sustained the damage, he had no cause of action, and we find that Mr. Jeansonne did not know, nor should have |inknown of Mr. Clinton’s negligence until such deficiencies were brought to his attention. Mr. Jean-sonne did not sustain damages by the mere existence of the alleged defects in the Promissory Note and Stock Purchase Agreement drafted by Mr. Clinton.
Mr. Jeansonne contends that the Promissory Note perfected by Mr. Clinton was to include a prepayment provision requiring the $1.5 million not to be paid earlier than one year and such payment would be contingent upon the secondary public offering of Omni stock successfully occurring before one year and Mr. Jeansonne’s ability to materialize $1.5 million from this event. The possibility of damage to Mr. Jeansonne was merely speculative, uncertain and contingent on the clause Mr. Jeansonne believed was incorporated into ■the promissory note and stock purchase agreement. In the event that this contingency did not occur, no harm at all would have resulted to Mr. Jeansonne. Because Mr. Jeansonne did not sustain damage until Mr. Morris sought to receive payment on the Promissory Note and filed suit in federal court on November 26, 1999, for recovery of the Promissory Note, in accordance with La. R.S. 9:5605, prescription began to run at that point and has not prescribed, as the present action was filed on March 16, 2000, less than one year after Mr. Jeansonne received notice, and well within the three-year peremptive period from the date of Mr. Clinton’s alleged malpractice, regardless of the date discovery of the alleged negligence was acquired.
Although we find that the trial court committed manifest error and was clearly wrong in finding that prescription began to run on the date Mr. Jeansonne signed the documents, our determination that Mr. Jeansonne sustained damage is not a determination on the merits that damage was indeed sustained by Mr. Jeansonne to any negligence on the part of Mr. Clinton, but is merely a | n determination that Mr. Jean-sonne sustained damage sufficient to support accrual of a cause of action against Mr. Clinton, and it is from this point that the prescriptive period begins to run. The determination whether Mr. Clinton was negligent and whether this negligence caused the damage complained of, as well as the extent of any such damage, is a matter which is to be determined on the merits.
For the foregoing reasons, the decision of the trial court dismissing Mr. Jeansonne’s claim on the grounds of per-emption was manifestly erroneous. The *729 trial court fully tried the case on the merits and considered all of the evidence adduced, the entire record, the arguments and memoranda of the parties, and found that the law and evidence were in favor of defendants; therefore, also dismissing the plaintiffs case on the merits. For the following reasons, we affirm the holding of the trial court in dismissing the plaintiffs case on the merits.
Mr. Jeansonne asserts that Mr. Clinton committed legal malpractice by failing to correctly draft and to disclose the full import of the Stock Purchase Agreement and Promissory Note, those consequences that may arise on execution of such agreements and in his failure to advise Mr. Jeansonne of an alleged conflict of interest. “Great deference is accorded to the trial court’s factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court’s judgment.” Vignette Publications, Inc. v. Harborview Enterprises, Inc., 2000-1711, p. 7 (La.App. 4 Cir. 9/12/01), 799 So.2d 531, 536. A “trial court’s finding of fact may not be reversed absent manifest error or unless they are clearly wrong.” LaBove v. Raftery, 2000-1394, p. 7 (La.11/28/01), 802 So.2d 566, 572. After a trial on the merits, the trial court dismissed the plaintiffs action on the merits. In its reasons for judgment, the trial court held:
haLTjhe alleged payment condition was not agreed to between Jeansonne and Morris or that plaintiff proved such and [sic] agreement. Quite the opposite is true. This is because such a condition is nonsensical in this transaction — -it either (i) would not have made economic sense to Morris and would not have been agreed to, or (ii) would have been completely unworkable, or (iii) both. The evidence showed that Morris wanted to obtain the full $2.5 million for his AAI stock, a very valuable asset, and would not have sold this asset for only $1 million, two-fifths of the agreed amount....
The sum and substance of Jeansonne’s testimony falls far short of proof that he and Morris had agreed to condition payment of the $1.5 million note on Omni’s successful completion of a secondary public offering. It also falls short of proof that Jeansonne ever told Clinton of such a condition, which Clinton absolutely denies.
Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court’s judgment. In the case sub judice, after careful review of the record, we find the trial court absent manifest error. It is not whether the trial court was right or wrong in its finding, but whether the trial court’s conclusion was a reasonable in light of the evidence presented. This Court may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. LaBove v. Raftery, 2000-1394, p. 7, 802 So.2d at 572.
Mr. Clinton and Mr. Jeansonne discussed the terms of the documents on July 8 and 9 via telephone. After Mr. Jean-sonne received the documents, he telephoned Mr. Clinton to discuss its content. The record establishes that Mr. Clinton included the provision as directed by Mr. Jeansonne relating to the Stock Purchase Agreement, which obligated Mr. Morris to use $500,000 received by him under the agreement to acquire stock in Omni. Further the Stock Purchase Agreement provided that if Mr. Morris failed to do so, $500,000 could be set off against the $1.5 million payment due under the promissory note. Jeansonne told Clinton he | ^wanted this provision to ensure Mr. Morris’ con *730 tinued interest as an employee of Omni. In addition to the Stock Purchase Agreement meeting the specifications of Mr. Jean-sonne, Mr. Clinton perfected the promissory note with a special mandatory prepayment provision requiring the note to be paid earlier than one year if a secondary public offering of Omni stock successfully occurred before one year and Mr. Jean-sonne was able to realize $1.5 million from this event. It is evidence in the record that Mr. Clinton was told to include these special provisions, and therefore such provisions were incorporated.
' The trial court found that Mr. Jean-sonne failed to inform Mri Clinton of his desire to incorporate a condition which would have excused or suspended the entire $1.5 million payment. The trial court reasoned, based on the evidence and credibility determinations, that at the time Mr. Jeansonne and Mr. Morris signed the documents, the secondary public offering of Omni stock has already been halted and Mr. Jeansonne had the financial ability to pay the note without having to sell any Omni share. Therefore, the trial court determined that Mr. Jeansonne informed Mr. Clinton that he and Mr. Morris agreed to a mandatory, prepayment of the note should there be “any underwritten public offering of Omni stock” and taking into account this provision in addition to the expressly stated unconditional promise to pay, such an assertion by Mr. Jeansonne that Mr. Clinton was negligent in drafting the Promissory Note, is inconsistent with the idea that payment was condition on the occurrence of a public offering. We agree with the trial court that it is unreasonable for Mr. Jeansonne to contend that the note payment was conditioned on the occurrence of an event already halted before the note was even prepared.
|14In addressing the issue of whether Mr. Clinton failed to communicate the consequences of signing the Promissory Note and Stock Purchase Agreement, the trial court reasoned:
Clinton exercised his professional judgment under circumstances where his client was sophisticated and experienced and had dictated the terms of a relatively simple transaction of a stock transfer and part payment via promissory note. The relations between Clinton and his client were consistent with prior relations in other transactions. Clinton’s professional judgment as to the nature and extent of explanations and advice to his client cannot be challenged as a matter of law.
In an attorney-client relationship the attorney has a duty to provide competent representation, this includes keeping the client reasonably informed and providing sufficient information, consultations, and advice so that the client understands the transaction and can participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. see Rules of Professional Conduct (RPC), Rule 1.4(b); see RPC Rules 1.1, 1.3, 1.4, 2.1. However, the client has the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer’s professional obligations. RPC Rule 1.2(a). Based on the record before us, we find, that Mr. Jeansonne negotiated the deal, then conveyed the deal terms to Mr. Clinton, who drafted the documents based on the. information he received from Mr. Jeansonne. We find that the trial court’s findings are reasonable in light of the record reviewed in its entirety, we affirm the judgment of the trial court, dismissing the plaintiffs claim on the merits.
lifiMr. Jeansonne further asserts that Mr. Clinton committed legal malprac *731 tice in failing to disclose his conflict of interest. Mr. Clinton verified his employment for legal services regarding the instant matter on April 21, 1998. Mr. Clinton had been the business and securities transaction attorney for Omni prior to the instant transaction. In fact, he attended board meeting and navigated Omni’s initial public offering. Mr. Jeansonne and Mr. Clinton had collaborated on several mergers and acquisitions. The fact Mr. Clinton was the attorney for Omni was known prior to the plaintiff retaining the defendant for the instant transaction. The transaction in question concerned a large amount of Omni stock. These facts were known by Mr. Jeansonne prior to Mr. Clinton’s retention and such knowledge should have placed Mr. Jeansonne on notice that a conflict of interest might be present. We find, as the trial court did, that the record establishes that in this transaction, Mr. Clinton represented solely the interests of Mr. Jeansonne and the corporation Mr. Jeansonne controlled through ninety percent (90%).
We therefore affirm the trial court’s judgment dismissing the plaintiffs claim of legal malpractice on the merits.
AFFIRMED.
MCKAY, J., Concurs In The Result.
TOBIAS, J., Concurs In The Result And Assigns Reasons.

. We note the date of the signed Stock Purchase Agreement and Promissory Note was July 17, 1998.