802 So.2d 566 (2001)
Donna LaBOVE, et vir.
v.
Roy RAFTERY, Jr., et al.
Nos. 2000-C-1394, 2000-C-1423.
Supreme Court of Louisiana.
November 28, 2001.
Rehearing Denied January 11, 2002.
*568 Glenn W. Alexander, Jerry G. Jones, Jack C. Watson, Jones & Alexander; Joan M. Canny, Eliska M. Plunkett, Ernst F. Preis, Jr., McGlinchey Stafford; Counsel for Applicant (No. 2000-C-1394).
Robert B. MacMurdo, Steffes & MacMurdo; Byrlyne Van Duke, Vandyke-Dowers Law Firm; Counsel for Respondent (No. 2000-C-1394.)
Robert B. MacMurdo, Steffes & MacMurdo; Byrlyne Van Duke, Vandyke-Dowers Law Firm; Counsel for Applicant (No. 2000-C-1423.)
Glenn W. Alexander, Jerry G. Jones, Jack C. Watson, Jones & Alexander; Joan M. Canny, Eliska M. Plunkett, Ernst F. Preis, Jr., McGlinchey Stafford; Counsel for Respondent (No. 2000-C-1423).
JOHNSON, Justice.[*]
This action was brought by plaintiff to recover damages for age discrimination *569 and intentional infliction of emotional distress against her employer, Cameron State Bank. We granted this writ of certiorari to determine whether the jury's determination that Cameron State Bank is liable to plaintiff for age discrimination and intentional infliction of emotional distress was manifestly erroneous. After reviewing all of the evidence and testimony in a light most favorable to plaintiff, we hold that the evidence was insufficient to support the jury's verdict in favor of plaintiff. Accordingly, we reverse the decisions of the lower courts and dismiss plaintiff's action.

FACTS AND PROCEDURAL HISTORY
In 1978, at the age of thirty-two, Donna LaBove ("plaintiff") began working for Cameron State Bank ("CSB") as a teller. She worked at the bank for approximately one month, then quit because she thought her supervisor was "abusive" and "belittled employees." She returned to the bank three months later and went to work in the bookkeeping department. Over the years, she rose through the ranks to become head bookkeeper and assistant cashier, a position which required her to maintain all bank records, help customers open accounts, and supervise bank deposits, including the issuance of certificates of deposit. In the course of her employment, she received training in marketing and public relations, and in March of 1984, she became Assistant Vice-President for Public Relations and Marketing. As Assistant Vice-President, plaintiff was required to perform duties for CSB at its headquarters in the Town of Cameron, as well as at several branch facilities in rural Cameron Parish. She served in that position during the tenures of three bank Presidents.
CSB began to experience financial hardships, primarily from its poor portfolio of farm loans and poor policies, procedures, and management. In 1991, the bank only made $14,000 in profits. In 1992, it suffered a 2.3 million dollar loss. On April 1, 1992, because of the bank's precarious financial position, the bank's board of directors hired Roy Raftery, a man with twenty-seven years of banking experience, as Executive Vice-President. Raftery's role was to give direction to the bank's President. When the bank continued to deteriorate, the president was asked to resign. On August 20, 1992. Raftery became CSB's new President. Immediately upon his installation, in an effort to save the bank, Raftery began to change policies, procedures, and personnel assignments.
At the time Raftery assumed the presidency, plaintiff headed CSB's marketing and public relations in Cameron Parish. She also headed marketing and advertisement in Lake Charles and Sulphur. Her duties included opening the Cameron branch daily, testing job applicants, and training new employees, and making customer calls, during which she would visit customers and pass out trinkets from the bank. She also represented the bank at various community functions.
In January, 1993, Raftery promoted plaintiff from Assistant Vice-President to Vice President. At that time, according to plaintiff's testimony, her duties included assisting lobby traffic, giving assistance and directions to customers, serving as backup person for new accounts, public relations (attending local functions, meetings, banquets, seminars), keeping track of all advertisements run by CSB's competitors, reviewing ads, planning and chairing monthly new account seminars, training employees, assisting the purchasing clerk, ordering supplies, assisting and compiling data for incentive programs, and planning new services programs for bank assistants.
In February, 1993 bank regulators completed an audit of the bank. On March 15, *570 1993, the Federal Deposit Insurance Corporation (hereinafter "FDIC") placed CSB under a "cease and desist" order.
To avert bank closure, CSB's management immediately changed bank operations. Raftery assumed responsibility for CSB's major marketing. Plaintiff continued to do minor marketing tasks, such as placing advertisements for the bank in school and church programs. In addition to her current duties, plaintiff assumed the role of supervising tellers at the Cameron, Creole, Grand Chenier, and Johnson Bayou branches of the bank. Supervising the janitors in Cameron also became part of her duties. Greg Wicke was hired as branch manager, and Evelyn Landry was hired as assistant branch manager. Another new policy altered the chain of command so that all CSB employees at the Cameron branch, including plaintiff, were required to report to Wicke and Landry.
In May, 1994, the CSB employee who handled purchasing and ordering supplies resigned. Consequently, plaintiff assumed sole responsibility for those duties. On March 6, 1995, Raftery hired Leslie Harless as the director of marketing and public relations. He also relieved plaintiff of her new employee training responsibilities and reassigned that duty to Tonya Goss, the bank's new accounts clerk.
In late 1995, plaintiff communicated to bank management that her job had become too stressful and was adversely affecting her health.[1] In an attempt to accommodate her, Raftery offered plaintiff a less stressful position as branch coordinator/head teller at the CSB branch in Creole, Louisiana, which is located approximately 14 miles from Cameron, with no reduction in pay. Plaintiff declined that offer because she preferred to continue working at the main branch in Cameron.
Thereafter, CSB created a new position for plaintiff at the Cameron branch, which significantly reduced her responsibilities. Her new responsibilities were opening new accounts and serving as a backup teller. The bank also removed her responsibility for approval of checks and handling insufficient funds. Plaintiff was also informed that she would no longer represent the bank at community functions. Furthermore, because of her complaints that she had trouble lifting boxes, ordering supplies was removed from her job description. CSB also offered to provide a private counselor for six months to assist plaintiff with stress management. The bank expressed a willingness to provide the counseling at its expense and during bank hours if no after-hours appointments were available. Due to the significant decrease in her responsibilities, CSB reduced plaintiff's salary by approximately thirty percent.
On January 5, 1996, plaintiff sent a memorandum to Mary Robbins, the Senior Vice President of Operations, in which she detailed all of the duties she had been required to perform since 1993. While she thanked management for relieving her of the stressful responsibilities, she closed by requesting that her salary "remain at the 1995 salary level."
In mid-January, 1996, members of the bank's management team had a meeting with plaintiff and explained to her the new management decisions affecting her. She was informed that her new position was a dual one (new accounts and backup teller) because the number of new accounts opened in Cameron was insufficient to justify a full-time position. On the average, *571 only two accounts were opened per day at the Cameron branch. Plaintiff was also told that if she was unable to perform the duties of a backup teller, the bank would need to hire someone else, and her job and salary would be re-evaluated. Additionally, she was informed that the bank no longer needed a Public Relations person and that the duties she performed in the community on behalf of the bank would be executed by the branch manager and assistant branch manager. The branch manager and assistant branch manager were also assigned the duties of handling insufficient funds, approving service charges, and approving checks.
Soon thereafter, plaintiff expressed an interest in the head teller position previously offered to her at the Creole branch, but stated that she would need to be retrained as a teller.[2] CSB informed plaintiff that no other options would be discussed with her until she provided a written response as to whether or not she was able to perform her current job as backup teller and if she would participate in the Stress Management Program offered to her.
On April 29, 1996, plaintiff received an employee warning report for repeated errors in her new accounts duties. The complaint specifically stated that plaintiff placed the incorrect rates on certificates of deposit, one of which she never corrected. She was also cited for issuing a Trust certificate of deposit without obtaining management approval, entering incorrect maturity dates on certificates of deposit, placing incorrect addresses on documents, failure to secure approval for ledger tickets, and signing her brother's name to a transfer authorization between his account and his wife's account.
On June 28, 1996, plaintiff received the following employee warning report for poor performance concerning the following conduct:
1. Repeated certificate of deposit errors:
a. Wrong maturity dates
b. No social security numbers
c. Names not matching the computer
d. Incorrect phone numbers
e. Incorrect interest paid on certificates of deposit
f. Incorrect addresses
g. Incorrect social security numbers
2. Leaving teller keys overnight in desk drawer
3. Paying bills and balancing the checkbook for the Chamber of Commerce on bank time
4. Calling in sick without talking to the branch manager or assistant branch manager despite repeated warnings
5. Discarding bank property in the trash can
6. Putting customer funds in jeopardy by discarding returned customer checks with incorrect addresses in the trash can without shredding
7. Purposefully causing conflict and disrespect among bank employees toward management
Plaintiff was warned that she would be terminated if she continued to commit these violations.
As of July 1, 1996, plaintiff stopped reporting to work. She filed suit against CSB, Raftery, Wicke, and Landry, alleging that she was constructively discharged on February 27, 1997. She sought damages for age discrimination and intentional infliction of emotional distress. Raftery, *572 Wicke, and Landry were subsequently dismissed from the suit.
The case was tried by jury on September 14-18, 1998. The jury found that CSB, through its agents, employees, or officers, unlawfully discriminated against plaintiff because of her age. The jury also found that the bank, through its agents, employees, or officers, intentionally inflicted mental distress on plaintiff. The jury awarded $100,000 in general damages, $79,406 in loss of past earnings, and $489,340 in loss of future earnings. On December 3, 1998, the trial court ratified the jury's verdict by signing the judgment. On that same date, the trial court denied plaintiffs motion to assess attorney fees against CSB. Additionally, on May 15, 1999, CSB's motion for judgment notwithstanding the verdict and/or new trial or remittitur of damages was denied.
CSB appealed the trial court's judgment. Finding no manifest error, the court of appeal affirmed the jury's award. However, it denied plaintiffs cross-appeal for an increase in general damages and attorney's fees. LaBove v. Raftery, 99-1414 (La.App. 3 Cir. 4/19/00), 759 So.2d 240. Both plaintiff and CSB filed applications for certiorari with this court, and by orders dated September 15, 2000, we granted both applications. Labove v. Raftery, 00-1394 (La.9/15/00), 767 So.2d 698; 00-1423 (La.9/15/00), 767 So.2d 699.

DISCUSSION

Standard of Review
A trial court's findings of fact may not be reversed absent manifest error or unless they are clearly wrong. Stobart v. State of Louisiana, through Dep't of Transp. and Dev., 92-1328 (La.4/12/93), 617 So.2d 880. This court has a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. Because we have this duty, we must determine whether the verdict was clearly wrong based on the evidence, or clearly without evidentiary support. Id. The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 882-83 (citing Housley v. Cerise, 579 So.2d 973 (La.1991)) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).

Age Discrimination
CSB contends that there is no evidence to support plaintiffs age discrimination claim. Plaintiffs age discrimination allegation was based on the Louisiana Commission on Human Rights Act ("LCHRA")[3] and the Louisiana Age *573 Discrimination in Employment Act ("LADEA") which prohibits employers from discriminating against individuals because of age.[4] Because Louisiana's prohibition against age discrimination is identical to the federal statute prohibiting age discrimination,[5] Louisiana courts have traditionally looked to federal case law for guidance. See, e.g., King v. Phelps Dunbar, L.L.P., 98-1805 (La.6/4/99), 743 So.2d 181, 187; see also Barbe v. A.A. Harmon & Co., 94-2423 (La.App. 4 Cir. 1/7/98), 705 So.2d 1210, writ denied, 98-0526 (La.5/15/98), 719 So.2d 462. Disparate treatment cases are analyzed under the test developed for Title VII plaintiffs in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, 678 (1973). A prima facie case of employment discrimination based on age requires a showing that (1) the plaintiff is between forty and seventy years of age; (2) the plaintiff was qualified for the job at issue; and (3) an employee outside the protected class was treated more favorably. Deloach v. Delchamps, Inc., 897 F.2d 815, 818 (5th Cir.1990); McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. The theory of the McDonnell Douglas prima facie case is that the plaintiff must provide sufficient evidence to create an inference of unlawful intent, and the defendant, at the close of the plaintiffs evidence, generally challenges the prima facie case by a motion for directed verdict.
After the plaintiff satisfies the criteria to make a prima facie case, the burden shifts to the employer to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate non-discriminatory reason. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant's burden, in rebutting a prima facie case, is one *574 of production, not persuasion. See id. at 254, 101 S.Ct. 1089.
Thereafter, when all of the evidence has been presented, the overall evidence ultimately must be sufficient for the jury to conclude that age discrimination was the true reason for the employment decision. To prevail in a disparate treatment case, a plaintiff must show that the protected trait (under the ADEA, age) actually motivated the employer's decision. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Thus, age must actually have played a role in the employer's decision making process and had a determinative influence on the outcome. Id.
In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the United States Supreme Court addressed the "burden shifting" associated with age discrimination claims. The Court stated:
Although intermediate evidentiary burdens shift back and forth ..., "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253 [101 S.Ct. 1089]. And in attempting to satisfy this burden, the plaintiffonce the employer produces sufficient evidence to support a nondiscriminatory explanation for its decisionmust be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." Id.; see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, at 507-508 [113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)]. That is that the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." Burdine, supra, at 256 [101 S.Ct. 1089]. Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, St. Mary's Honor Center, supra, at 511 [113 S.Ct. 2742], the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom... on the issue of whether the defendant's explanation is pretextual." Burdine, supra, at 255 [101 S.Ct. 1089], n. 10.
Reeves at 143, 120 S.Ct. 2097. (Emphasis added).
In this case, plaintiff established a prima facie case of age discrimination under McDonnell Douglas. The record shows that plaintiff was forty-nine years old at the time of her resignation. As such, she was clearly within the age parameters set forth in McDonnell Douglas.
Secondly, the record establishes that from 1965-1971, plaintiff worked part-time at Calcasieu Marine as a teller, bookkeeper and proof operator. She completed a four week course entitled "The Essentials of Bank Marketing" in Boulder, Colorado. She also attended week-long marketing seminars in Atlanta, Georgia, Chicago, Illinois, and Washington, D.C. Additionally, plaintiff took bank marketing classes at Banking Institute at McNeese State University. She worked at CSB for several years before being promoted to Assistant Vice-President in charge of marketing and public relations. She remained in that position for nine years prior to being promoted to Vice-President. Also, Raftery testified that plaintiff "was and could have been and still could be an asset to the bank." Thus, because of her experience and training, it appears that plaintiff was qualified for the job.
*575 Additionally, the record indicates that many of plaintiff's duties were removed and reassigned to women outside of the protected age class. Although Raftery, who is older than plaintiff, initially undertook the marketing and public relations duties, two years later, he hired Leslie Harless, a thirty-eight year old woman, for that job. Subsequently, he hired Tonya Goss, who was then twenty-six years old, to take over new employment training. Raftery also hired Mary Mhire and Sonya Lalonde, both more than twenty years younger than plaintiff, to handle the opening of new accounts.
However, CSB produced an abundance of evidence to show that plaintiff's duties were changed for non-discriminatory reasons. The FDIC order in this case required CSB to cease and desist from, inter alia: unsound banking practices; operating with management whose policies and practices were detrimental to the bank and jeopardized the safety of its depositors or deposits, and operating with inadequate internal routine and control policies. The bank was also ordered to have management qualified to restore the bank to a "sound condition," develop a written management policy that contained evaluations, and develop a plan to recruit or replace personnel with the needed ability and experience.
CSB produced evidence that it removed plaintiff's responsibility for marketing and advertising because someone with more marketing expertise was needed to help the bank improve its poor financial condition. At the time the cease and desist order was given, the bank's major marketing endeavor was the customer call program in which a bank employee would visit bank customers, greet them, and give them trinkets from the bank. The bank also ran advertisements in high school football programs and church bulletins.
The bank's management determined that the customer call program plaintiff headed was an inefficient marketing tool to develop more business for the bank. Raftery gave unrefuted testimony that marketing has changed, becoming more computer oriented and more technical in nature, and the bank needed someone to head its marketing department who had the technical ability to handle marketing in a way which was more in tune with current trends. The bank's management also decided that it wanted someone who was computer literate to handle marketing. Plaintiff was admittedly unable to program a computer or perform data searches.
Raftery himself undertook marketing and public relations, and as a result, the bank rapidly recovered from the multimillion dollar loss it had experienced the previous year. Two years later, he hired Ms. Harless, who had nineteen years of banking experience. Raftery testified that he hired Ms. Harless because she was "very computer literate." Before coming to work at CSB, she worked in Retail Administration at First National Bank, a position which required her to work closely with the marketing department. When Ms. Harless was hired, CSB did not offer a debit card program like other banks, so one of her first projects involved developing a debit card program to provide the bank's customers with that service. Ms. Harless also developed other new products for the bank such as the "step-up" certificate of deposit and the "Maxell system." She testified that much of her job entailed researching new products or services, contacting other banks in the market to see if they offered a particular product or service, and if so, how it worked, checking CSB's data processing system to see whether it could handle the design of the new product or service, training employees on the new product or service, and marketing *576 or selling the product or service to the public.
CSB also presented evidence to the jury that Tonya Goss assumed plaintiffs employee training responsibility because plaintiffs techniques were ineffective. Ms. Goss gave unrefuted testimony that although plaintiffs training sessions were entertaining, they were ineffective, primarily because plaintiff was often unable to answer questions presented to her by employees. Plaintiffs method of training consisted of giving prizes to employees who opened the most accounts, training personnel in telephone etiquette, and cross selling. Employees' questions about accounts for minors and calculating interest on certificates of deposit went unanswered. Once Ms. Goss took over the employee training, she was able to pinpoint the most common errors made and trained employees accordingly. She initiated a system to track errors made on new accounts and certificates of deposit. She also re-trained plaintiff in opening new accounts because of plaintiffs frequent errors in that area.
Ms. Goss' testimony was corroborated by John Guilbeaux, the Senior Vice President and Chief Lending Officer. Guilbeaux testified that he attended one of plaintiffs training sessions after his administrative assistant complained that plaintiffs training sessions were "a waste of time." He stated that plaintiff played a game which was similar to "musical chairs" and gave prizes. According to him, the meeting was not productive concerning opening new accounts. Guilbeaux further testified that plaintiff was unable to answer questions from the trainees regarding opening and closing accounts. Based on his observations, Guilbeaux attested that he concluded that plaintiff was unable to conduct informative sessions, and he shared his conclusion with Raftery.
CSB further presented evidence to the jury that its actions toward plaintiff were justified because of the series of reprimands and warning reports she received due to poor job performance. She made repeated errors in calculating interest rates for certificates of deposit; she keyed in incorrect maturity dates for certificates of deposit, which resulted in penalties; she transferred funds from her brother's account to his wife's account by signing his name for him. Moreover, in January, 1994, plaintiff was placed on probation for using profanity in the lobby of the bank during business hours. Further, the bank showed that plaintiff used bank time to balance the Chamber of Commerce's checkbook and that she disposed of incorrectly addressed customer checks in the trash, rather than having them shredded.
Finally, the record shows that after plaintiff complained of stress-related injuries, CSB offered to provide her with professional stress management counseling for a six month period at the bank's expense. However, plaintiff declined the offer for fear of being stigmatized as mentally unstable.
Plaintiff admitted to making repeated errors regarding certificates of deposit. She explained that when she worked the teller window, if a customer came in to purchase a certificate of deposit, she was required to leave the window, go to her desk, type the certificate of deposit, and "put it on" before two o'clock. She also had to balance her teller drawer by two o'clock.
Plaintiff also admitted to transferring the funds for her brother "all the time" because he is a fisherman who is only home on the weekends. She stated that she had always done it, and never had problems because she was an officer. It was only when the bank took away her *577 officer's duties that she could no longer handle transfers.
Plaintiff further admitted to leaving the teller keys in the drawer. However, she seemed to attach no significance to her actions because the key "does not open the main vault." Nevertheless, she stated that she left the keys in the drawer because she had no intentions of returning to work.
As for the accusation that she balanced the Chamber of Commerce's checkbook on bank time, plaintiff testified that it only took about five minutes. She also stated that other bank officers often did similar things.
Plaintiff also indicated that many of her duties were removed at her own request because of her high blood pressure. Her job of ordering supplies was assigned to someone else after she complained that ordering and lifting the supplies was too much for her.
Moreover, the only evidence submitted to support plaintiffs claim of age discrimination was the testimony of Don Fruge, Sandra DeShields, and Belinda Miltenburger. Fruge, a long-time colleague of Raftery's and a former CSB employee, testified that Raftery had once revealed to him that he liked young, attractive women. However, the record reveals that Raftery made that comment around 1973 when he was thirty-two years old. DeShields stated that she tried to help plaintiff with supplies because "she's an older person" and was straining to pick up heavy boxes. Miltenburger also testified that she tried to help plaintiff with supplies, but Evelyn Landry told her not to help because it was not her job to do so.
Accordingly, we find that the jury's finding that CSB discriminated against plaintiff because of her age is unreasonable in light of the record reviewed in its entirety. There was no showing that plaintiffs age actually played a role in CSB's decision making process or that it had a determinative influence on the outcome. See Reeves, 530 U.S. at 141, 120 S.Ct. 2097. Thus, we reverse the lower courts' determination that plaintiff is entitled to recover based upon discriminatory practices based upon her age.[6]

Intentional Infliction of Emotional Distress
CSB asserts that the conduct plaintiff complains of failed to meet the standard for intentional infliction of emotional distress established by this court in White v. Monsanto, 585 So.2d 1205 (La.1991). In White, the plaintiffs supervisor "launched a profane tirade" at the plaintiff (who was described as "a church-going woman in her late forties with grown children") and other workers who were sitting idly in the workplace. Amidst the vulgar tirade, the supervisor threatened them with dismissal. This court found that the supervisor's conduct did not constitute the tort of intentional infliction of emotional distress. We stated:
[In] order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

*578 The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. Not every verbal encounter may be converted into a tort; on the contrary, "some safety valve must be left through which irascible tempers may blow off relatively harmless steam." [Second] Restatement [of Torts], comment d, § 46 Prosser and Keaton, The Law of Torts, § 12, p. 59 (5th ed.1984).
White at 1209.
Louisiana's courts of appeal have staunchly adhered to the standard established in White. In Stewart v. Parish of Jefferson, 95-407 (La.App. 5 Cir. 1/30/96), 668 So.2d 1292, writ denied, 96-0526 (La.4/8/96), 671 So.2d 340, the plaintiff asserted that a supervisor harassed him for two years by questioning his personal life, increasing his workload, and pressuring him to accept a demotion which ultimately led to his termination. The court held that intentional infliction of emotional distress was not shown. The plaintiff in Beaudoin v. Hartford Acc. & Indem. Co., 594 So.2d 1049 (La.App. 3 Cir.), writ denied, 598 So.2d 356 (La.1992), alleged that she was singled out for abuse when a supervisor shouted at her, cursed her, called her names (dumb, stupid, and fat), commented about the inferiority of women, and falsely accused her of making mistakes. The court found that the supervisor's conduct did not constitute extreme and outrageous conduct.
In Smith v. Ouachita Parish Sch. Bd., 29,873 (La.App. 2 Cir. 9/24/97), 702 So.2d 727, writ denied, 97-2721 (La.1/16/98), 706 So.2d 978, the plaintiff had been employed in the school system since 1969. She was a tenured school teacher of business courses and had a master's degree and 30 graduate hours in secondary guidance and counseling. In 1990, she was transferred within the school system and assigned to teach in special education, an area in which she was not trained. She was later assigned to the Professional Development Center, where she was assigned to help physically disabled students adapt to a workplace environment. Her duties included supervising a student with cerebral palsy who performed menial tasks for State Farm Insurance and a cricket farm. She filed suit against the school board, alleging that she was wrongfully demoted and transferred within the school system, and as a result, she suffered emotional and psychological distress. The court noted that, while the plaintiff may have felt humiliated and unproductive, a reasonable person would have complained about being placed in special education, or at least sought more meaningful or additional assignments. The court stated:
[The school board's personnel director] acknowledged that [the plaintiff] was placed in jobs that were not the best situation for her. While we agree that the Board may have taken better advantage of [plaintiffs] education and experience, this does not mean that the Board's conduct was extreme and outrageous.
More recently, this court reviewed another claim of intentional infliction of emotional distress. In Nicholas v. Allstate, 99-2522 (La.8/31/00), 765 So.2d 1017, the plaintiffs supervisor had warned him on numerous occasions that his production figures were not up to expectation. According to a company policy, the plaintiff *579 was placed on corrective review of poor performance. When the plaintiff failed to meet the goals set, he was placed on personal review and received a written warning that his job was in jeopardy. After failing to achieve goals placed by a supervisory panel, the plaintiff was terminated. The jury found the employer liable for intentional infliction of emotional distress, and the court of appeal affirmed that decision. This court, however, reversed, finding the evidence insufficient to "reach the high threshold for intentional infliction of emotional distress established in White," stating:
[A]lthough we might question [the supervisor's] motives, we recognize that disciplinary action and conflict in a pressure-packed workplace environment, though calculated to cause some degree of mental anguish, are not ordinarily actionable.
Nicholas 765 So.2d at 1030 (citing White at 1210). In Nicholas, we also recognized that Louisiana's jurisprudence is in conformity with federal jurisprudence.[7]
Finally, in Deus v. Allstate Ins. Co., 15 F.3d 506 (5th Cir.), cert. denied, 513 U.S. 1014, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994), a case more analogous to the instant case, the employee was displeased with his employer's new program which affected his office's operations. The employee complained that his employer required him to do more than others, used a special review on him, but not others, to downgrade his performance, and instituted a long term plan to move younger persons into sales and management positions. The employee alleged that he suffered a "mental breakdown" as a result of the employer's actions. The court, citing White v. Monsanto, supra, stated that the employer's "alleged mistreatment of [the employee] was not sufficiently thoughtless to rise to the level of outrageousness necessary to impose liability under Louisiana law."
In the case sub judice, plaintiff complains that the bank's overall treatment of her constitutes extreme and outrageous conduct. Plaintiff testified that she was repeatedly harassed by Wicke and Landry. She stated, "[Ms. Landry] got a type of enjoyment out of making you little belittle you in front of people or suffer." She also testified, "Ms. Landry hollered at you all the time, all the time. She always talking to you in a raised voice," sometimes in the presence of the tellers and customers.
Belinda Miltenburger testified that Landry belittled plaintiff in front of customers. She stated that she felt sorry for plaintiff and described plaintiffs demotion as "degrading." She also testified that she assisted plaintiff with supply orders until Landry told her that it was not her job to help plaintiff. However, other bank employees indicated that Landry's tirades were not reserved for plaintiff. Sandra DeShields testified that Landry yelled "at everybody." Tina Savoie testified that Landry made it a point to know everything *580 that was happening in the bank, and she scrutinized everything.
Plaintiff also testified that during her performance evaluation in February, 1994, Raftery referred to the people of Cameron Parish as "gee-gees" and stated that he had to put pictures in the ads in the Cameron newspaper because the people were "too dumb to read." She stated that she became so upset by Raftery's comments that she felt ill. Raftery categorically denied making any such comments. Further, the testimony revealed the evaluation was conducted in the presence of two other bank employees, John Guilbeaux and Greg Wicke. Guilbeaux testified unequivocably that Raftery never made such comments. Wicke did not testify at trial.
Plaintiff further alleged that during that same evaluation, Raftery told her that he had taken a notebook that belonged to her and had read it. She testified that she kept the notebook at her desk as a journal to detail her work and business activities. She also kept a record of her participation in various community events on behalf of the bank, mileage, and any expenditures for reimbursement purposes and made notations regarding other bank employees, including any unauthorized vacation time taken by some of the bank's officers. Plaintiff testified that Raftery informed her that the information she had recorded about other employees was "none of [her] business" because "he ran the bank."
Raftery admitted that he saw the notebook lying on the floor under plaintiff's desk, and he took it and read it. He testified that he had heard rumors around the bank that plaintiff kept the notebook as an "insurance policy" and to keep tabs on her superior officers. He expressed a concern that the contents of the notebook could possibly cause "morale problems" within the bank. Plaintiff testified that she saw the notebook on Raftery's desk when he confronted her about its contents. Plaintiff left the meeting without taking the notebook with her. Not once did she allege that she demanded that her notebook be returned to her.
Next, plaintiff testified that she was required to "do teller work." She stated that, while she had no problems assisting the tellers, she "lost it one day" when she had to handle a large deposit. She maintained that she did not know how to use the new computerized teller machine. She described the machine as a "foreign animal" and expressed that she had only had one training session which lasted one hour.
DeShields testified that plaintiff "had a lot of teary days." According to DeShields, plaintiff was upset because her desk had been moved around and that she no longer had as much contact with the customers because the bank's public relations policies had been changed. She testified that plaintiff's feelings were hurt when customers questioned her about working as a teller. She stated that working as a teller was stressful for plaintiff because it required taking deposits and cashing checks. She stated that plaintiff had difficulties and that plaintiff had to be retrained on the machine and it took plaintiff a "long time to balance." She stated that Landry and Wicke told her not to associate with plaintiff.
Further, plaintiff complained that when the bank's locks were changed, she did not receive a key. She stated that she had always had a key to the bank and that she would open the bank every day and make coffee. Plaintiff testified that the bank's former practice was to give employees a key to the bank. She stated, "I had a key from day one. When you become an employee, you get a key to the branch." She averred that once the bank's locks were changed, only three people got keys: *581 the branch manager, the assistant branch manager, and the head teller.
Raftery confirmed that he decided not to give plaintiff a key to the bank because she had been observed moving boxes from the building. Plaintiff admitted to moving boxes from the building; however, she denied moving bank documents, claiming that the boxes contained records from an community organization that she was involved in.
To further bolster her claim of intentional infliction of emotional distress, plaintiff contends that requiring her, a Vice President, to report to the branch manager and assistant branch manager, constitutes outrageous conduct. Prior to Raftery's tenure, plaintiff had always reported to the bank's President. However, when Raftery took over, he worked primarily from the Lake Charles office, and according to plaintiffs testimony, he seldom even visited the Cameron branch. Moreover, Raftery explained that when the bank was required to restructure its management, it made sense to require all employees, including plaintiff, who was in charge of new accounts, to report to the managers of the bank.
Plaintiff also complains that her salary was cut by approximately thirty percent. However, the bank explained that the cut in salary was a result of the significant decrease in her duties. Plaintiff was no longer over marketing, public relations, employee training, supplies. In fact, to prevent plaintiffs salary from being reduced, the bank offered her a position at a different branch. Plaintiff declined that position, and settled for a position opening new accounts and serving as backup teller.
Finally, we also note Raftery's testimony regarding some of plaintiffs conduct which was discussed in plaintiffs performance evaluation which was conducted in February, 1994, which evaluated plaintiffs job performance from January 1, 1993 through January 2, 1994. Raftery testified as follows:
A. Well, that she made inappropriate statements pertaining to management stating that she was not going to adhere to management's directions unless she was told even though management had had officers that attended the Officers' Meeting to report back the information that was not inthat they were not in attendance. It further went on to counsel her about these inappropriate statements, particularly where she used the words, "F___ them."
Q. Do you remember specifically this portion of the meeting you had where you reviewed these inappropriate statements with Ms. LaBove?
A. I certainly do. That was the very first thing before we got into the evaluation.
Q. What do you remember saying to her and what do you recall her saying to you about inappropriate statements from Ms. LaBove?
A. I simply asked her if she used that word in the lobby of the bank and she looked me straight in the eyes, which kind of surprised me, and then she just said, "Yes, I did," and then I said, "Well, did you say that you could make or break me in Cameron Parish and if you went down, I was going with you?" She looked at me directly in the face and said, "Yes, I did," and at that time I said, "Donna, you know, I really have a problem with a Vice President of the bank, particularly since I made you a Vice President of Cameron State Bank nine months ago and gave you your first raise in about four years, that you would act that way. Particularly since you're supposed to be P.R. or Public Relations and if you're going to do that in the bank, what are you going to do out of *582 the bank," and then we went into her evaluation.
Raftery's testimony was corroborated by Guilbeaux and Wicke. At that time, plaintiff was placed on probation for ninety days for her behavior, and it appears the above conduct set off the bad feelings between plaintiff and Raftery.
After reviewing all of the evidence in a light most favorable to plaintiff, the conduct of which plaintiff complains can in no way be said to rise to the level of "extreme and outrageous." According to Raftery's testimony, as well as plaintiffs own testimony, and various documentary evidence submitted by both parties, plaintiffs duties were diminished and replaced with lower level tasks because of her frequent complaints that her combined duties were causing her stress and were affecting her health. The evidence also shows that plaintiffs demotion was caused by her poor job performance and her behavior as well. Thus, it is evident that plaintiffs job duties were changed as a result of her job performance and behavior at the bank, rather than any attempt to inflict severe emotional distress on plaintiff.
While we are always loathe to reverse a jury's determination, we cannot ignore the overwhelming evidence that plaintiff was demoted for just cause. As this court observed in White, employers must be given "reasonable latitude" when making employment decisions. It is unrefuted that CSB suffered a 2.3 million dollar loss in 1992 and was in jeopardy of going under. Thus, it was necessary for the bank to make some progressive reconstructive changes to restore the bank's profitability. The evidence is overwhelming that plaintiff was not a productive employee for CSB. Her marketing techniques were no longer effective in an increasingly technology-geared banking industry, and her method of training employees was ineffective. In fact, plaintiff had to be retrained due to frequent errors in opening new accounts and in handling certificates of deposit. Even more telling are plaintiffs poor performance evaluations due to her errors, handling personal matters on bank time, and her disregard of the bank's policies regarding transfer of funds between customers' accounts.
We acknowledge that some of plaintiffs contributions to the bank were laudable. However, based on plaintiffs evaluations, her performance was grossly deficient in some major areas. Employers cannot be required to continue to employ workers who are under-productive and/or ineffective. It was a simple management strategy to reassign plaintiffs duties to others who obtained better results.
Accordingly, we find that the evidence submitted by plaintiff was insufficient to support her claim of intentional infliction of emotional distress. Thus, we hold that the jury's determination that CSB is liable to plaintiff for intentional infliction of emotional distress was manifestly erroneous as it was unsupported by the evidence.

CONCLUSION
For the foregoing reasons, we hold that the jury was manifestly erroneous in finding CSB liable for age discrimination and intentional infliction of emotional distress. Accordingly, we reverse the judgments of the lower courts and dismiss plaintiffs action.
REVERSED AND RENDERED.
KNOLL, J., dissents in part, concurs in part and assigns reasons.
KNOLL, Justice, concurring in part and dissenting in part.
I am in agreement with the majority's determination that LaBove's age discrimination *583 claim must fall because the evidence failed to preponderate that age discrimination was the motivation for CSB's actions. However, I disagree with the reversal of the jury verdict that found for LaBove on her claim against CSB for the intentional infliction of emotional distress. I find the record evidence fully supports the jury verdict on this issue. CSB could have simply terminated LaBove without subjecting LaBove, a bank vice-president, to menial tasks, and embarrassing and humiliating events. I find it particularly egregious on CSB's part that while it required LaBove to perform duties beneath the rank of a bank vice-president, it never lowered her titled position.
The majority opinion today does grave injustice to our manifest error doctrine so well established in our uniqueness as a civil law state and our review of fact.[1] We are not following the very jurisprudence we made in cautioning the appellate courts to affirm a trial court's findings of fact unless such factual determinations are manifestly erroneous or clearly wrong. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216; Stobart v. State of Louisiana, through Dep't of Transp. & Dev., 617 So.2d 880 (La.1993); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). In the present case, a jury of twelve members rendered a verdict for the plaintiff on this purely factual issue; the trial judge denied defendant's motion for judgment notwithstanding the verdict and a three-member panel of the court of appeal affirmed the jury verdict. It behooves us now to remind ourselves of the roots of manifest error review so that we might respect the role of our three-tiered court system[2] which forms the basis for this standard of review and that there is a need for us to temper our tendency to substitute our opinion for those of the fact-finders. Without such a perspective, the trial court's quintessential fact-finding role will be compromised.
The evidence presented in this case supports that the issue of intentional inflection of emotional distress presented a close case. A trier of fact virtually cannot commit manifest error in circumstances where the evidence supports a close issue, i.e., when the evidence can reasonably support the verdict or judgment either way. Under these circumstances the trier of fact makes the decision which should be affirmed by the upper courts. A reversal of a close decision is not correcting a manifest error, but is upending the doctrine of manifest error.
In Syndics of Brooks v. Weyman, 3 Mart. (o.s.) 9, 1813 WL 749 (La.1813), this Court recognized that manifest error review was necessitated because of the inherent weaknesses in the jury trial, "if it must depend on the caprice, ignorance, or information of a jury." Id. at 13. However, as well stated in Trimble's Syndics v. New Orleans Ins. Co., 3 Mart. (o.s.) 394, 1814 WL 920 (La.1814), this Court astutely *584 observed that "we must presume that [the jury] weighed and discussed [the case] as they ought to have done; ... this verdict... ought not to be disturbed. Trimble's Syndics, 3 Mart. (o.s.)" at 396. Consequently, in Walton v. Grant, 2 Mart. (n.s.) 494, 1824 WL 1655 (La.1824), we stated:
The question is one of fact alone and the rule established in this court is, that the decision in the inferior tribunal always governs here, unless it clearly appears to be erroneous.

Walton, 2 Mart. (n.s.) at 494. (emphasis added).
What we said permeates the jurisprudence of this Court to this day and serves as the bedrock upon which our manifest error doctrine is firmly planted. Notwithstanding this well established doctrine acknowledged by the majority, the commencement of the majority opinion states that the evidence and testimony has been viewed "in a light most favorable to plaintiff." Labove at 569. In this case, the jury neither acted capriciously or ignorantly, nor was it misinformed.[3] With total disregard to the reasonableness of the jury's verdict, the majority re-weighs the evidence and substitutes its opinion for that of the jury even though this case is highly fact intensive and presented a close issue.
As observed in Nicholas v. Allstate, 99-2522 (La.8/31/00), 765 So.2d 1017, those facts which constitute outrageous conduct are based upon the perceptions of the "average member of the community." Nicholas, 765 So.2d at 1022. CSB argues that the facts of this case are no more than petty incidents which occurred over more than two years that would not cause an average member of the community to exclaim "outrageous!" A recitation of record evidence shows clearly that the jury did not commit manifest error.
The record shows that in the early days of Raftery's presidency, he let it be known to Fruge that he did not like LaBove and that he wanted to replace her with someone else who could perform her marketing and advertising duties. Although he admitted this to Fruge, he also testified that the bank "couldn't stand any more bad publicity." Despite promoting LaBove to vice-president, the record shows that Raftery contemporaneously realigned the chain of command, making LaBove, a superior bank officer, report to persons of lesser rank, and assumed her marketing and advertising duties.
During LaBove's annual evaluation in early 1994, Raftery told her that he had taken her personal diary, read it, and threw it away. In the course of this evaluation, LaBove stated that Raftery referred derogatorily to Cameron Parish residents as "gee-gees" and explained that he utilized pictorial advertisement in the local newspapers because the local residents were too dumb to read. LaBove, the only bank officer from Cameron Parish, detailed that these comments personally offended her; she said that these comments reduced her to tears and nauseated her. Shortly after, when Raftery reaffirmed that LaBove was to report to junior corporate personnel, Wicke, the head cashier, and Landry, the assistant cashier, LaBove testified that her telephone calls to Raftery *585 to discuss this corporate anomaly went unreturned.
Sandra DeShields, a fellow employee of LaBove, described Landry as a very loud, aggressive, ornery type. She stated that Landry boasted that she was LaBove's boss and that, like it or not, LaBove had to do whatever she said. According to DeShields, Landry quickly had LaBove performing tasks that would not have been expected of a bank vice-president. She further testified that this treatment adversely affected LaBove.
One of the tasks assigned to LaBove was that of ordering and filling supply orders for the bank branches. Even though LaBove had difficulty lifting the boxes, DeShields was told by Paula Pool and Landry that she was not to provide assistance. DeShields described this treatment as belittling to LaBove and that the performance of these menial tasks caused LaBove to often cry.
Tina Savoie, a co-worker who was employed at CSB before Raftery's presidency and who became re-employed after his presidency, graphically contrasted LaBove's tasks during these periods. Whereas LaBove was a major player in the bank's day-to-day operations during Savoie's first period of employment, she found in her second period of employment that LaBove's duties had significantly diminished. She further explained that Landry constantly watched everything that LaBove did. Like DeShields, Savoie was told by Wicke and Landry that she was not to associate with LaBove because she was a bad influence. In essence, she testified that she found LaBove's treatment degrading.
Like Savoie, Belinda Miltenburger was employed at various times at CSB. She mirrored Savoie's observation of LaBove's duties at the bank. She stated that she was embarrassed for LaBove and felt that her treatment was degrading. She, too, was told by Landry not to assist LaBove with the supply orders.
The record further shows that the lessening of LaBove's duties and prominence was noticeable to Jennifer Bercier, a bank stockholder and a person in Cameron whose banking needs LaBove serviced. Ms. Bercier was so moved that she wrote a letter of concern to CSB. After some delay, Raftery assured Bercier that LaBove was still a vice-president and that he was not attempting to get rid of her.
In a January 17, 1996 meeting, LaBove's supervisors told her that she was no longer allowed to perform public relations or outside meeting work because of financial constraints and the need to standardize managerial functions. In a memorandum issued that same day, LaBove's authority to approve NSF checks, service charges and check approvals was removed. The memo stated, "so these functions have been reassigned and are gone forever from your job description ... whether those things were or were not stressful to you." (P 21). At that same time, Pool informed LaBove that if she was unable to work as a teller, a job that LaBove had informed her supervisors in writing caused her stress, CSB would be forced to hire someone else and re-evaluate whether LaBove would still be considered a full-time employee.
At approximately this same time, Raftery had the locks to the Cameron bank changed because he thought that LaBove was stealing bank property. Although La-Bove had traditionally opened the bank and made the morning coffee for staff, she was not provided with a new key. Raftery had learned that Landry saw LaBove moving boxes from the bank. Both Landry and Raftery testified that they did not speak to LaBove about her (LaBove's) suspected nefarious activity. In actuality, the *586 evidence shows that the boxes LaBove removed contained Chamber of Commerce material that she was returning to the community organization. Had either Raftery or Landry spoken to her about this activity, not only would they have learned the nature of her actions, but would also have learned that Wicke, the branch manager, held the bank door open for her and further helped her carry the boxes to her automobile.
Finally, after a string of reprimands (LaBove's transference of $50 between her brother's bank accounts, the fur festival poster incident mentioned in the majority opinion, her balancing of the checkbook for the Cameron Chamber of Commerce), LaBove chose to stop coming to work at CSB.
After examining this evidence, taking into mind the work place setting of this conduct and CSB's asserted perspective that its actions resulted in a series of petty incidents, I find that the jury was presented with two permissible views of the evidence. In its instructions to the jury, the trial court stated that CSB could only be liable if it was guilty of "atrocious conduct which exceeds all bounds usually tolerated by a decent society; ... so outrageous in character and extreme in degree as to go beyond all possible bounds of decency." The trial court further tempered the jury determination by further instructing them that "mere insults, indignities, threats, annoyances" were insufficient and that "disciplinary action and conflict in a pressure packed workplace environment, although calculated to cause some degree of mental anguish is not ordinarily actionable." Speaking as "average member[s] of the community" who were well instructed by the trial court, I find that the jury determination that CSB's conduct was outrageous is a finding that can be well supported by the record.
As an additional criterion for recovery, it was necessary for LaBove to establish by a preponderance of the evidence that CSB's conduct produced severe emotional distress. It was well established that CSB's handling of LaBove caused her to cry and become nauseated at her evaluation, and that employees found her crying several times at the bank. The evidence also shows that Sandra DeShields found LaBove shaking and non-responsive at her teller window and that she had to be taken to her physician for treatment. Moreover, all of the expert medical testimony showed that LaBove was suffering from severe depression in the months leading to her removal from CSB. Accordingly, I find that the jury did not abuse its discretion in finding that the evidence preponderated that the emotional stress that LaBove suffered was severe.
The final criterion that LaBove had to prove was that CSB desired to inflict severe emotional distress or that it was at least substantially certain that such would follow from its conduct. As sketched below, I find no manifest error in the jury's determination of this issue.
The oral statements that Fruge attributed to Raftery about his desire to remove LaBove indicate an animus from the upper level of CSB management as to the treatment she received. That this hostile treatment came from above was affirmed in the comments that Wicke made to Burl LaBove when he complained about the treatment his wife was receiving. Moreover, the oral reprimands that La-Bove publicly received from a lower ranking bank official are highly indicative of an attack directed to LaBove and fully show the outrageous treatment that CSB leveled against LaBove, a bank vice-president. Furthermore, the gradual stripping of LaBove's functions which she had mastered through the years and the replacement *587 of those duties with menial tasks usually performed by younger, less experienced employees, highlight the desire of CSB's upper management to inflict severe emotional distress or at least shows that severe emotional distress was substantially certain to follow from its conduct. When I view CSB's actions within the context of Louisiana's well accepted at-will employment doctrine, I find that CSB's demeaning treatment of LaBove is further exacerbated because it is clear that her employment could simply have been discontinued.
It is well accepted that whether an injured person's medical condition was caused by tortious conduct is a question of fact which should not be reversed on appellate review absent manifest error. Housley v. Cerise, 579 So.2d at 973, 979; Mart v. Hill, 505 So.2d 1120, 1127-28 (La. 1987). Both Dr. Aretta J. Rathmell and Dr. David Post, a psychiatrist and psychologist, respectively, who appeared on LaBove's behalf, testified that job stress, more likely than not, caused LaBove's depression. In addition, Dr. Sheldon Hersh, defendant's medical expert, admitted that work related stress was a significant causative factor in LaBove's depression.
Throughout the course of the trial, the issues of LaBove's use of diet pills and the temporal onset of her hypertensive condition were debated. Dr. Hersh, a "medical detective" who testified on behalf of CSB, advanced the point that his interpretation of LaBove's medical history as recorded in the notes of doctors and nurses showed that LaBove had taken diet pills for two years.[4] He opined that it was common pharmaceutical knowledge that diet pills can cause high blood pressure, depression, and emotional instability. LaBove's treating family physician, Dr. Richard Sanders, testified that he had prescribed diet pills for LaBove for a total of six weeks during the ten years that he had treated her. Ultimately, I note, however, that even Dr. Hersh admitted that LaBove was still depressed when he saw her in 1998, approximately three years after LaBove had taken diet pills.
Dr. Hersh also attempted to suggest that his reading of the medical records indicated to him that LaBove suffered from high blood pressure before the period of her emotional turmoil at CSB. To rebut this contention, LaBove presented Dr. Sanders's, the physician who had treated her through the years, who unequivocally stated that LaBove did not suffer from a pre-existing high blood pressure condition.
A reviewing court must constantly be mindful that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Stobart v. State of Louisiana, through Dep't of Transp. & Dev., 617 So.2d 880, 882-83. Consequently, when there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id. Applying the well accepted jurisprudential framework that I have outlined regarding appellate review through the years, I believe the appellate court correctly determined that the jury was not manifestly erroneous in its determination that CSB's actions caused LaBove's medical condition.
*588 Today a majority of this Court ignores the findings of a jury composed of average members of the Cameron community, substitutes its appreciation of the facts, and strips LaBove of a judgment which I find is fully supported by a reasonable reading of the record. For these reasons, I respectfully dissent from that portion of the majority opinion which denies LaBove recovery from CSB for the intentional infliction of emotional distress.
NOTES
[*] Justice Harry T. Lemmon, retired, participated in the decision in this case which was argued prior to his retirement.
[1] The evidence reveals that plaintiff was hospitalized for high blood pressure while on vacation in October, 1995.
[2] Plaintiff had worked as a backup teller the previous week and had to leave work early because she had difficulty using the teller machine and handling transactions.
[3] LSA-R.S. 51:2231 provides:

A. It is the purpose and intent of the legislature by this enactment to provide for execution within Louisiana of the policies embodied in the Federal Civil Rights Act of 1964, 1968, and 1972 and the Age Discrimination in Employment Act of 1967, as amended; and to assure that Louisiana has appropriate legislation prohibiting discrimination in public accommodations sufficient to justify the deferral of cases by the federal Equal Employment Opportunity Commission, the secretary of labor, and the Department of Justice under those statutes; to safeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age, disability, or national origin in connection with employment and in connection with public accommodations; to protect their interest in personal dignity and freedom from humiliation; to make available to the state their full productive capacities in employment; to secure the state against domestic strife and unrest which would menace its democratic institutions; to preserve the public safety, health, and general welfare; and to further the interest, rights, and privileges within the state.
B. The prohibitions in this Chapter against discrimination because of age in connection with public accommodations shall be limited to individuals who are at least forty years of age.
C. The Louisiana Commission on Human Rights shall have enforcement powers including adjudication of claims of discrimination prohibited by R.S. 23:312, 323, and 332, sickle cell trait discrimination prohibited by R.S. 23:352, and discrimination because of pregnancy prohibited by R.S. 23:341 et seq.
[4] LSA-R.S. 23:971-75 (repealed by Acts 1997, No. 1409 § 4, eff. Aug. 1, 1997). Prior to its repeal, LSA-R.S. 23:972 provided in pertinent part:

It is unlawful for an employer to:
(1) fail or refuse to hire, or to discharge, any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of the individual's age;
(2) limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of the individual's age; or
(3) reduce the wage rate of any employee in order to comply with this Part.
When LSA-R.S. 23:971-75 was repealed, it was replaced by the Louisiana Employment Discrimination Law, LSA-R.S. 23:301 et seq.
[5] Age discrimination is defined in the Age Discrimination in Employment Act of 1967 ("ADEA"), codified as 29 U.S.C. § 621 et seq.
[6] Plaintiff filed a separate writ application, arguing that she is entitled to attorney's fees under the age discrimination statute. Because we hold that plaintiff failed to meet her burden of proving that CSB's actions were motivated by her age, the issue of attorney's fees is moot.
[7] In Glenn v. Boy Scouts of America, 977 F.Supp. 786 (W.D.La.1997), the court held that telling an employee that she was rumored to have had a sexual affair with a prior scout executive, being told that her placement next to a financial donor who liked her was because she might get more money from him, communication to her that he did not want a woman in her position, being called a "total disgrace" in a staffing meeting, and being told that she would be terminated on an undisclosed volunteer complaint unless she voluntarily resigned, did not constitute extreme and outrageous conduct. In Trahan v. Bellsouth Tel., Inc., 881 F.Supp. 1080 (W.D.La.), aff'd, 71 F.3d 876 (5th Cir.1995), the employer used a security team to ridicule, tease, and taunt the plaintiff for seven and one-half hours of questioning. The court held that the employer's conduct was not outrageous conduct.
[1] The term "manifest error" first appeared in Louisiana jurisprudence in Moore v. Angiolette, 12 Mart (o.s.) 532, 533, 1823 WL 1455 (La.1823). See also GEORGE W. PUGH, THE MANIFEST ERROR RULE, 21 La. Law Rev. 740 (1961). See also WILLIAM E. CRAWFORD, SHOULD LOUISIANA RETAIN CIVIL APPELLATE REVIEW OF FACTS?, 35 La. B.J. 244 (1987).
[2] "Louisiana's three-tiered court system allocates the fact finding function to the trial courts. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987). Due to that allocation and the trial court's opportunity to evaluate live witnesses or to evaluate a mixture of deposition and live testimony, great deference is accorded to the trial court's factual findings. Id." Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1111 (La.1990).
[3] It is on this fact that Nicholas v. Allstate, 99-2522 (La.8/31/00), 765 So.2d 1017, a cased that I authored, is clearly distinguishable. In Nicholas, the trial judge's failure to properly instruct the jury on the essence of the tort of intentional infliction of emotional distress interdicted the jury's decision. In the present case, the record shows that unlike Nicholas, the trial judge properly instructed the jury. Thus, the jury decision in the present case was fully informed and based upon close examination of the demeanor and credibility of the various witnesses.
[4] It is unclear in the record what specific medical evidence Dr. Hersh relied upon to reach this conclusion. One possible explanation was a notation in Dr. Carlos Choucino's medical charts that LaBove had taken diet pills approximately two years before when Dr. Sanders treated her.